## MILLER v. ELGIN, JOLIET & EASTERN RY. CO.

### No. 9831.

United States Court of Appeals
Seventh Circuit.

Oct. 7, 1949.

Rehearing Denied Nov. 2, 1949.

Harlan L. Hackbert, Chicago, Ill., Glenn D. Peters, Hammond, Indiana (Peters & Highland, Hammond, Indiana, Knapp, Cushing, Hershberger & Stevenson, Chicago, Illinois, of counsel), for appellant.

Daniel D. Lynch, Hammond, Indiana, T. Cleve Stenhouse, Crown Point, Indiana, for appellee.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

DUFFY, Circuit Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for the death of plaintiff's husband, Joseph Miller. The case was tried to a jury which returned a verdict in favor of plaintiff.

Joseph Miller was employed by the defendant railway company as operator of an

interlocking tower at Griffith, Indiana. This tower controlled the movements of all trains through the area in which the tracks of the defendant and four other railroads intersected by means of electrically operated signals, switches, cross-overs and derails, and was known as the Griffith Interlocking Plant. The tower was a two-story brick structure, on the ground floor of which was located a room containing a hot water heating system and another room containing the relays of the electrical interlocking system. Upon a second level there was a room housing the batteries which supplied the electrical current for the system. The control room on the second floor was reached by an outside metal stairway. In this room was the interlocking machine which, by manually operated levers, controlled the switches and derails as well as flash signals at highway crossings.

The course of the electrical current was from the batteries through a conduit to a master switch in the control room, thence to the interlocking machine, thence through numerous wires in a metal chute to the relay machines, and thence to the various units of the interlocking system.

Miller's tour of duty was from 4:00 P. M. to midnight. On January 7, 1947, he arrived at the tower shortly before 4:00 P. M. and was in apparent good health. About 7:50 P.M. he smelled smoke in the tower and telephoned that information to David Letts, the signal maintainer, who was his immediate superior. At Letts' direction Miller looked at the wiring in the relay room and then reported to Letts that the wiring was ablaze. Letts immediately drove to the tower from his home one and one-half blocks distant, and Miller meanwhile called the fire department. When Letts arrived Miller was standing near the tower at the foot of the outside stairway. Letts went into the tower and found the fire was in a metal chute, which contained approximately 400 wires leading from the interlocking machine to the relays. The rubber and fabric covering on the wires was ablaze. Letts then went up the outside steps and entered the control room. He made two attempts to reach the master switch which was on the opposite side of the room from the door, but he was unable to do so because of the dense smoke and fumes. His purpose was to pull the manually operated switch in order to cut off power to the interlocking control machine. Letts told Miller he was unable to reach the switch, but that he intended to cut the wires at the batteries and, going down the outside steps, he obtained pliers and then went into the battery room. Deterred by the smoke and fumes from the burning insulation in the relay room, Letts only succeeded in cutting some of the wires, but he told Miller he intended to go back and cut the remainder.

When the fire department arrived firemen tore the cover from the metal chute and used chemicals and water in extinguishing the fire. They also put a ladder to the center window of the second floor, intending to break the glass in order to permit the smoke and fumes to escape from the room and to provide ventilation. At Miller's suggestion the ladder was moved over several feet to the adjoining window, which was immediately adjacent to the control board on which the main switch, which Letts had tried to reach, was mounted. Miller climbed the ladder, broke the window, and leaned into the room, remaining in that position for possibly one to two minutes. Shortly after Miller came down the ladder, he complained of pain in his chest and he was nauseated. Miller's wife, who had come to the tower, took him in an automobile to a doctor's office, but Miller died about two minutes after reaching the office and before he could be examined by the doctor. Medical testimony established that Miller died from a thrombosis in the artery to the lower lung and opinion evidence was given that his exposure to the smoke and fumes had a causal relationship to his death.

Letts testified that his first thought was to get the power disconnected, and that was the reason he attempted to reach the main switch. Letts stated that cutting off the current would prevent the possibility of false indications on the lines out to the var-

226

ious signals, and that if such a false indication had occurred a train might have been wrecked as a result. Letts also testified, "I wanted to get that switch open for the protection of the machine, with the wires burning as they were, short circuit and that, which creates a hot fire and will spread more rapidly; * * *"

It is undisputed that although five freight trains had been stopped while the fire was in progress, a passenger train was due about that time, and that some of the signals were operated at such a distance from the tower as not to be visible therefrom.

At the time of his death Miller was 53 years old and had earned $3,194.09 in the year preceding his death. Over defendant's objection, Mortality Tables were received in evidence which showed that decedent's life expectancy was 18 years and his widow's 16 years.

■ Defendant assigns as error that evidence of defendant's negligence was insufficient to take the case to the jury and that its motion for a directed verdict should have been granted. Defendant also claims that the doctrine of res ipsa loquitur is not applicable, that Miller's own conduct was the sole cause of his death, and that Miller's action cannot be excused under the doctrine of imminent peril. Defendant also assigns as error the admission into evidence of the Mortality Tables, in instructing the jury that it could allow damages for decedent's mental anguish, and in permitting the widow to testify as to her inability to work at the time of the trial.

We are of the opinion that there was sufficient evidence of probative value to make the question of negligence a jury question. The testimony disclosed that the metal chute containing a bundle of 400 wires had not been examined for a period of four months, that the tower was subject to vibrations from passing trains which could cause wires to rub together, that insulation on the wires does deteriorate, that after previous examinations some of the wires had to be replaced because of the deteriorated condition of the insulation, and that Letts, Miller's superior, knew that deteriorated insulation might cause a fire.

The evidence that defendant failed to provide a safe place to work because it had not installed near the source of the electrical power a main fuse which would cut off the current and prevent the possibility of false indications on the lines was worthy of credence. Defendant argues that a main fuse would not have eliminated the fire once it was started. This may be correct, though beside the point, for when wires remain alive and are arcing, it is like throwing fuel on a flame, or as Letts said, "* * * short circuit * * * which creates a hot fire and will spread more rapidly." In any event, if such a fuse had been installed, neither Miller nor Letts would have had to risk the dangers of their attempts to reach the main switch because the dead wires would have eliminated the possibility of false indications on the lines.

■ Defendant argues that the doctrine of res ipsa loquitur is not applicable to the facts in this case, because neither a short circuit nor defective insulation can be inferred from the mere fact of the fire itself. Defendant confidently asserts there is no authority or precedent where such doctrine has been applied where loss resulted from a fire. We agree that ordinarily the doctrine of res ipsa loquitur cannot be applied to a fire. Nearly always when the origin of a fire is unknown, it would be manifestly unfair to infer one particular cause, eliminating all others which are just as probable. But here no-one even suggests any other cause than a short circuit. The metal chute was so located and constructed that there was no possibility of a match or lighted cigarette coming in contact with the wires enclosed therein.

Of course, just prior to the fire, no-one saw cracked or worn insulation on the wires down in the metal chute. We think that under the circumstances, the application of the doctrine of res ipsa loquitur was proper. This rule furnished circumstantial evidence of negligence which could be weighed by the jury, but the jury

did not have to accept it. "* * * Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff." Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815, Ann.Cas.1914D, 905.

The trial court did not err in instructing on the doctrine of res ipsa loquitur.

■ No witness at the trial was better qualified than Letts to give an opinion as to the cause of the wire insulation burning. It was his duty to maintain and repair the system, and he apparently was well qualified. Letts' statement heretofore quoted was in itself sufficient to justify the jury in inferring that the fire was caused by a short circuit due to worn or deteriorated insulation, and that the condition of the wires constituted negligence proximately causing Miller's death.

■ Defendant lays greatest stress, however, upon the proposition that it was error for the court to instruct the jury upon the doctrine of imminent peril. Defendant argues that after having reached a place of safety, Miller voluntarily exposed himself to danger, and that his own conduct in so doing was the proximate cause of his death. Defendant insists that Miller's actions cannot be excused under the doctrine of imminent peril.

Miller undoubtedly knew from his long experience working in the tower that a short circuit might send false indications over the lines which might erroneously give a green light to approaching trains. If that happened a train wreck would likely follow, which would endanger the lives of the train crew and passengers. In any event Miller had witnessed the almost frenzied efforts of Letts to cut off the current at the main switch, and he knew of Letts' efforts to cut the wires near the battery. Miller recognized that Letts had greater technical knowledge than he, and he might reasonably have concluded that Letts was motivated by a most compelling reason in his efforts to cut off the electrical current.

Defendant quotes authorities for the doctrine that in order to justify one in risking his life or serious injury in rescuing another from danger, the danger threatened to the latter must be imminent and real and not merely imaginary, that some one must be actually in peril or at least the situation must be such to induce a reasonable belief that some person is in imminent peril.

We do not quarrel with the defendant's statement but believe that the situation here considered brings Miller's actions within the rule stated. Even if Miller thought that reaching in through the window to pull the switch might place him in grave danger of injury, it was reasonable for him to believe that current continuing through the system was imperiling the life and safety of others. However, the jury could also have reasonably inferred from the evidence that it never occurred to Miller that reaching into the room through the window was placing himself in grave danger. He had seen Letts twice go into the control room and once into the battery room, with no apparent ill effects.

■ Defendant urges error because Miller's widow was permitted to answer at the trial that her physical condition was such that she could not then work. The answer was given prior to an objection. However, after her answer, an objection was made that the question was immaterial. No motion to strike the answer was made, and the objection that such answer was prejudicial is offered for the first time in this court. Neither the question nor the answer gave the jury any information about Mrs. Miller's financial status, and under the circumstances we do not think prejudicial error occurred.

We have considered the other assignments of error, but we cannot sustain them. Judgment affirmed.