Joseph A. KERANEN, Appellant,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, Appellee.

No. 97–CV–1368.

District of Columbia Court of Appeals.

Argued Jan. 28, 1999.
Decided Jan. 6, 2000.

Francis P.. Hajek, with whom Richard N. Shapiro, Virginia Beach, VA, was on the brief, for appellant.

Johnny M. Howard, Washington, DC, with whom Barbara E. Brown, was on the brief, for appellee.

Before WAGNER, Chief Judge and STEADMAN and REID, Associate Judges.

REID, Associate Judge:

Appellant Joseph A. Keranen filed a complaint under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* against the National Railroad Passenger Corporation ("Amtrak") on September 27, 1995, after being injured in a fire while working on board a train bound from Montreal to the District of Columbia. The trial court granted directed verdicts in favor of Amtrak.

Mr. Keranen contends on appeal that the trial court erred in: (1) granting a directed verdict motion in favor of Amtrak on his "failure to train or instruct" claim after his opening statement; (2) granting Amtrak's motions for directed verdicts with respect to his claim of failure to provide a safe workplace due to: (a) an alleged "too heavily sprung" ladies' lounge door and Amtrak's failure to inspect and repair the door; (b) the lack of smoke detectors on each train car; and (c) an electrical fire; and (3) making certain evidentiary rulings, including: (a) refusing to admit evidence pertaining to the existence of smoke detectors on some Amtrak cars and the lack of them on others, as well as evidence regarding a petition by Amtrak employees to require smoke detectors on cars; (b) refusing to admit into evidence two documents, Amtrak's letter of commendation for his role in ensuring the safety of passengers during the fire, and a record of "defect history" for the train car in which the fire occurred; (c) excluding portions of a non-expert witness's testimony regarding the origin of the fire; and (d) permitting Amtrak's counsel to inquire into Mr. Keranen's background to elicit testimony concerning his prior history of alcohol use and his psychological treatment. We affirm the trial court's directed verdict as to Mr. Keranen's training claim; and affirm its directed verdicts with respect to his safe workplace cause of action relating to the lack of smoke detectors and an alleged electrical fire, but reverse as to his claim of a "too tightly sprung" door to the ladies' lounge and Amtrak's alleged failure to inspect and repair the door and remand for a new trial on that claim.

**FACTUAL SUMMARY**

On September 27, 1995, Mr. Keranen filed a personal injury action against his employer, Amtrak. In his complaint he alleged that on March 1, 1993, "at or near Waterbury, Vermont, [he] was injured as a result of an on-board fire in the ladies' lounge on [Amtrak's] passenger car." Paragraph 6 of his complaint declared that in violation of the FELA, Amtrak:

> failed to provide [him] with a safe place to work and safe equipment with which to work in that the car was defective and caught fire; that defendant failed to inspect, find, repair and warn [Mr. Keranen] of his dangerous condition; that [Amtrak] and its agents failed to issue and arrange for appropriate warnings and training prior to [Mr. Keranen's] accident; and that as a result of this negligence and carelessness on the part of the defendant and its agents, [Mr.

Keranen] suffer[ed] severe and permanent injuries.

Keranen sought damages for loss of income, physical pain and mental anguish.

Trial began on July 7, 1997. Mr. Keranen testified that he began work at Amtrak in January 1993 as a train and service attendant. On March 1, 1993, he was assigned to car 4726 as a train attendant on the Montrealer for a round trip journey between the District of Columbia and Montreal, Canada. Prior to departing the District, Mr. Keranen inspected car 4726. In a document called the Map 21 or the Map Book, in which problems were recorded during inspection, Mr. Keranen "noted that the door was extremely heavily-sprung in the ladies lounge." He noticed that "[t]he door had been previously ... written up." When he re-inspected car 4726, prior to the return trip from Montreal, he observed that the ladies' lounge door had not been repaired. The Map 21 document was not introduced at trial because it could not be found.

As the train proceeded toward Waterbury, Vermont, Mr. Keranen observed "a film of smoke" in car 4726. The smoke came from "the top of the ladies' lounge door." He felt the door but "it was not burning hot." Using both hands, he "couch[ed] down and ... opened the door" a few inches. He pushed a little more with "[his] left hand on the door and [his] right hand on the door jamb...." "The floor was ... glowing red." The smoke "was building up real fast." Mr. Keranen "let go of the door and ... turned and when [he did], [his] right knee hit very hard the door jamb." He "was twisting at the time [he] fell backwards and ... had released the door." Mr. Keranen maintained that the door "was springed too close and closed real tight. It was constantly pressing against [him]."[1] He alerted another train attendant, Cheryl Tyler, about the fire. As Mr. Keranen and Ms. Tyler evacuated passengers, Mr. Keranen hit his knee against a chair.

When the train pulled into Waterbury, Vermont, local firefighters arrived and extinguished the fire. Mr. Keranen watched the firefighters cut the floor of the ladies' lounge. He saw "[a] lot of scorched or burned up particle board and ... burnt wires.... The pipes had quite a bit of burning on them also."[2]

Although his knee was causing him pain, Mr. Keranen did not report his injury immediately but eventually informed another member of the crew. He did not attempt to obtain medical assistance in Waterbury. Upon his arrival in the District, however, he sought medical help at the hospital. Two months later when he still experienced problems with his knee

---

1. A March 1, 1993 Amtrak investigation committee report stated:

Mr. Keranen twisted his right knee during the process of evacuating passengers and removing their baggage and personal belongings from car 4726. Mr. Keranen's right knee was examined at the National Orthopedic Hospital by Dr. James Eskew. No injury to Mr. Keranen's right knee was reported.

A March 5, 1993 injury report filed by Mr. Keranen revealed that he had a "twisted knee." He explained that he twisted his knee:

During the first minute of emergency I believe I hit [my knee] on ladies lounge door jam[b] when backing or turning to exit.

He later modified this statement to read: "First few minutes of emergency and organizing evacuation and control efforts."

2. The trial court rejected the argument that Mr. Keranen had electrical training. Although counsel for Mr. Keranen asserted that he had an associate degree in electronics, the trial judge pointed out that he was trained in "Basic Two Way Radio Repair." Mr. Keranen testified on direct examination that he "had experience with electricity and electronics." On cross-examination, he stated that he was an electronics technician but acknowledged that he was not an electrician.

Mr. Keranen also testified that car 4726 "had numerous times where the electrical system had been written up [in the Map Book]; breakers had been replaced in the electrical locker; numerous light bulbs ha[d] been out. So, they had been replaced." The trial court declared that: "Light bulbs and breakers do not necessarily infer fire under the floorboard in the ladies' lounge."

and had "tremendous difficulty walking, bending, [and] lifting," Mr. Keranen again sought medical attention. He was given anti-inflammatory medication and physical therapy. Ultimately, he had surgery on his knee, but the pain continued. Following more physical therapy, he returned to work in January 1994. He stopped work in August 1994, however, because of his inability to stand without severe pain. He then underwent a second surgery. The pain persisted.

Ms. Tyler testified that she used the ladies' lounge about ten to fifteen minutes before the fire was discovered. The lounge was very hot but Ms. Tyler did not see any smoke. She stated that the door to the ladies' lounge was difficult to open. After Mr. Keranen told her about the fire, she accompanied him to the ladies' lounge, "opened the door, and at that time, there were flames coming through the floor." Ms. Tyler and Mr. Keranen proceeded to evacuate the passengers. Later, Ms. Tyler noticed that the firefighters were working outside and underneath the car in which the ladies' lounge was located. She observed electrical wires underneath the car. She was unaware of any problem with Mr. Keranen's leg until they were taken to a hospital after the train arrived in the District. On cross-examination, she acknowledged that she "did not perceive of any unsafe conditions [on the train] that required [her]" to make a written record.

Robert Wiggins, who began his employment with Amtrak at the same time as Mr. Keranen, worked as a train attendant, service attendant, food specialist and chef during his tenure with Amtrak. He stated that he and Mr. Keranen received two weeks of training that included fire safety training during one afternoon. They "saw a video ... that ... talked about ... basic

fire—how to handle the fire basically." Each member of the class also "got [one] spray of the fire extinguisher."

Vicky Eby, Mr. Keranen's sister, worked for a time as head of the Safety Department for Amtrak Auto Train. She described her brother's swollen and worsening knee condition, his inability to participate in sports as he did before March 1, 1993, and his difficulty climbing stairs. She also discussed the type of inspections Amtrak performed on its trains. Interior and undercarriage inspections took place before departure to and from the train's destination and any problems detected were recorded in the Map 21 Book. She "believed" that she saw the Map 21 document which was on car 4726 on March 1, 1993, but could not recall the name of the person who filled out the information for that day.[3] Furthermore, because no "expert testif[ied] that a prudent carrier has smoke detectors," Ms. Eby was not permitted to present testimony concerning her complaints about smoke detectors and her petition "to have smoke detectors put on the [Amtrak train] cars."

The trial court permitted certain portions of the videotape deposition testimony of Edward J. Eldredge,[4] who was the Fire Chief of Waterbury, Vermont at the time of the fire, to be presented to the jury. Mr. Eldredge was not qualified as an expert in the causes of fires. As his regular occupation, he pre-stained wood siding. He also served as the zoning administrator for Waterbury, Vermont. In his testimony, he asserted that he and his workers opened up part of the floor in the ladies' lounge, observed glowing and charred particle and hardboard, and used water to extinguish the glow. He saw an electrically operated heater and "the wires leading to it had been—the insulation had been

---

**3.** When the Map 21 Book could not be found, counsel for Mr. Keranen did not seek a ruling, either during discovery or in the pretrial conference, that it "ha[d] been destroyed or [was] unobtainable." Consequently, the best evidence rule was invoked, and the trial judge sustained an objection to the question: "Do

you recall seeing on the form any electrical problems that were indicated for that car prior to March 1 st of 1993?"

**4.** Mr. Eldredge's last name also appears in the record as "Eldridge."

burned off." On cross-examination, he acknowledged that he did not consider himself to be "an expert on fire origin" and had "received [no] specific training on fire origin."

For the defense, Amtrak presented the testimony of Dr. James Brian Wade, a clinical psychologist, Dr. Wayne Lindsey, an orthopedic surgeon, and Dr. Charles Harry Epps, Jr., also an orthopedic surgeon. Dr. Wade summarized Mr. Keranen's alleged alcohol abuse problem, sexual disorder, and bipolar disorder or manic depressive illness. He also stated that Mr. Keranen had "mild pain sensation" but "severe cognitive suffering." Dr. Lindsey diagnosed Mr. Keranen's problem as "a plica" or "some thickening tissue in his knee that was causing him the pain that he was describing." He performed surgery on Mr. Keranen's knee in October 1993. On December 9, 1993, Dr. Lindsey expressed the view that Mr. Keranen's "soreness at this time appears to be disproportionate to any significant physical findings." He thought Mr. Keranen "should resume full work activity" with Amtrak. After examining Mr. Keranen again in January 1994, he saw no significant problems. Dr. Epps examined Mr. Keranen in July 1996. He opined that Mr. Keranen had a six percent permanent impairment of the right knee function which left him "substantially a great deal of function in the knee."[5] Moreover, he determined that Mr. Keranen was able to perform the functions of a train attendant.

During trial, the judge made several pertinent rulings. After Mr. Keranen's opening statement, the trial court directed a verdict as to the "failure to train or instruct" claim because Mr. Keranen had failed to assert it sufficiently. The trial court stated:

You did not mention training. Is there a specific claim on training? Because we went through this during the pretrial, Counsel. Relative to his lack of training to meet an emergency situation of this nature, you have not in any way indicated that that is a claim that you have.

At the close of Mr. Keranen's evidence, the trial court granted Amtrak's second motion for a directed verdict on the claim of negligence regarding the failure of Amtrak to provide safe equipment. It found that Mr. Keranen had not provided the necessary mechanical or expert evidence to support his claim that the "tightly sprung" door constituted a dangerous condition. The trial judge said in part:

It is an allegation of mechanical defect. Such allegation is unsupported in the evidence except by the Plaintiff's unschooled representation. Oversprung, hard to open, does that equal a mechanical defect? The court would say no. Also, further in the absence of evidence of failure to inspect and to correct, there is no evidence that, in fact, the door was not, in fact, properly sprung. But, just difficult for the Plaintiff to open.

. . . .

Therefore, the dangerous condition is not proven.

. . . .

The history of the oversprung door being negligent and a dangerous condition, on that challenge by the defense as to the insufficiency of the evidence at this time, even under F.E.L.A., the Court finds that the Plaintiff has failed.

The court also revisited the training issue and said:

The part about failure to properly train prior to the plaintiff's accident,

---

5. This opinion was consistent with that of Dr. Arthur Wordell who performed surgery on Mr. Keranen's knee in October 1994. Dr. Wordell concluded that Mr. Keranen suffered a "six percent permanent partial impairment of the right knee." Dr. Wordell recommended certain work restrictions, on certain actions, including "standing, bending, those types of activities." Dr. Wordell's videotape deposition was shown to the jury, but the deposition transcript apparently was not included in the record on appeal.

there is no evidence of any inappropriate training, and what was not trained for.

In terms of whether or not we place before the jury whether or not the video instruction was inappropriate, not knowing the contents of the video, the court will not allow the jury to speculate upon the content and the cogency of the video and the exercise with the extinguisher.

On the fifth day of trial, after all the evidence had been presented, the trial court granted Amtrak's third motion for a directed verdict which pertained to all remaining claims. It did so because Mr. Keranen failed to present evidence from which the jury could infer that Amtrak's electrical circuitry caused the fire. Because of this failure, the trial judge rejected Mr. Keranen's reliance on the doctrine of *res ipsa loquitur*, stating:

Counsel wishes me to jump to the conclusion that [the fire] had to be electrical because the Fire Department tore up the floor leading to electrical systems under the floor of the ladies lounge. However, no one had testified that this was an electrical fire. No one. So we have no predicate causation, and we

have no evidence of failure to inspect or maintain anything relative to this car.

. . . .

[I]n the absence of an inspection standard that was breached, and in the absence of any evidence that the cause of the fire was, in fact, electrical, you are opening the jury up to the forbidden area of complete speculation of inferring from unknown facts a cause of a known fire.

Mr. Keranen challenges the directed verdict decisions in favor of Amtrak, and other rulings of the court. The other challenged rulings concern decisions excluding or allowing certain evidence: (1) the existence of smoke detectors on some Amtrak cars, the lack of them on others, and a petition by Amtrak employees to require smoke detectors on train cars;[6] (2) two documents, Amtrak's letter of commendation of Mr. Keranen and Ms. Tyler, and a record of "defect history" of the car 4726;[7] (3) portions of Mr. Eldredge's deposition testimony regarding the cause of the fire;[8] and (4) testimony concerning Mr. Keranen's history of alcohol abuse and his psychological problems.[9]

---

**6.** The trial judge permitted Mr. Keranen to introduce testimony that there were no smoke detectors on car 4726, but ruled that he had to make some showing as to Amtrak's duty to install the smoke detectors. As the trial judge put it: "The standard that he must prove is that a prudent railroad operator has smoke detectors in cars." Counsel for Mr. Keranen proffered the testimony from an Amtrak supervisory employee that "he would like to see a smoke detector on every car," and from Mr. Keranen that "had there been a smoke detector, he would have vacated the car and he would have become aware of the fire much earlier."

**7.** Mr. Keranen attempted to introduce the "defect history" of car 4726 through Mr. Darryl P. Butler, Amtrak's manager of claims service. However, Mr. Butler was not familiar with the "defect history" document. Moreover, Amtrak objected as to the document's relevance since it revealed no defect in car 4726 prior to March 1, 1993. The court noted "cr[y]ptic remarks" on the document

which a jury could not understand without interpretation. These remarks included the terms "equalizer slab, tread shells, ... chipped disk, [and] treaded shell." The court described the document as "gibberish" which would be "very confusing and not helpful to the jury." However, the court was willing to admit the document if Mr. Keranen could present the testimony of "somebody who can tell us what it, in fact, says."

Counsel for Mr. Keranen wanted to introduce Amtrak's letter commending Mr. Keranen and Ms. Tyler for their actions in response to the fire because it also "showed that the fire started under the ladies lounge floor." This was the same reason for which he wanted to introduce the "defect history." The court declared that the reference to the fire was hearsay.

**8.** Mr. Eldredge was not qualified as an expert on the origin of fires.

**9.** This information was presented through the testimony of Dr. Wade.

## ANALYSIS

*FELA and the Standard of Review*

■ FELA specifies in pertinent part that "every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars...." 45 U.S.C. § 51. Although FELA is a "remedial statute," it "is not a strict liability statute." *Doty v. Illinois Cent. R.R. Co.,* 162 F.3d 460, 463 (7th Cir.1998); *see also Deans v. CSX Transp. Inc.,* 152 F.3d 326, 330 (4th Cir.1998). Nor is it a "workers' compensation statute," but it must be "liberally construed." *See Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).

■ FELA imposes on a railroad "a duty to use reasonable care furnishing its employees with a safe place to work." *Fogg v. National R.R. Passenger Corp.,* 585 A.2d 786, 789 (D.C.1991) (citing *Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 558, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987)). Nonetheless, "FELA 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of [an employer's] liability is ... negligence, not the fact that injuries occur.'" *Id.* (quoting *Ellis v. Union Pac. R. Co.,* 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947)) (other citations omitted); *see also McMillan v. National R.R. Passenger Corp.,* 648 A.2d 428, 432 (D.C.1994) (quoting *Brady v. Southern Ry.,* 320 U.S. 476, 484, 64 S.Ct. 232, 88 L.Ed. 239 (1943)). "What constitutes negligence for [FELA] purposes is a federal question." *Gottshall, supra,* 512 U.S. at 543, 114 S.Ct. 2396 (quoting *Urie v. Thompson,* 337 U.S. 163, 174, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)). A plaintiff who brings an action under FELA, however, is "required to prove traditional common law elements of negligence: breach, foreseeability, and causation." *Brown v. CSX Transp., Inc.,* 18 F.3d 245, 249 (4th Cir.1994) (quoting *Robert v. Consolidated Rail Corp.,* 832 F.2d 3, 6 (1st Cir.1987)).

■ "Negligence is the failure of [a railroad's] agents to do what a reasonable and prudent [person] would ordinarily have done under the circumstances of the situation." *McMillan, supra,* 648 A.2d at 432 (citations and internal quotations omitted). Therefore, "a plaintiff who wishes to demonstrate that a railroad breached its duty must show circumstances that 'a reasonable person would foresee as creating a potential for harm.'" *Williams v. National R.R. Passenger Corp.,* 161 F.3d 1059, 1062 (7th Cir.1998) (quoting *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 295, 300 (7th Cir.1996)). As the Supreme Court stated in *Gallick v. Baltimore & O.R. Co.,* 372 U.S. 108, 117, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963), "[t]he concept of foreseeability limits the scope of the duty owed"; and "reasonable foreseeability of harm is an essential ingredient of [FELA] negligence"; *see also McMillan, supra,* 648 A.2d at 432; *Norfolk & Western Ry. Co. v. Johnson,* 251 Va. 37, 465 S.E.2d 800, 805 (1996). While the "meaning [of 'reasonable foreseeability'] remains somewhat elusive and abstract," *Williams, supra,* 161 F.3d at 1062, it is generally associated with the concepts of actual or constructive notice. *Id.; see also Sinclair v. Long Island R. R.,* 985 F.2d 74, 77 (2d Cir.1993) ("The essential element of reasonable foreseeability in FELA actions requires proof of actual or constructive notice to the employer of the defective condition that caused the injury.").

■ With respect to the employer's duty owed to a railroad employee, "'[t]he employer must perform proper inspections to discover dangers in the place where employees are required to work, and after determining the existence of dangers the employer must take reasonable precautions for the employees' safety.'" *John-*

*son, supra,* 465 S.E.2d at 805 (quoting *Norfolk and Western Ry. v. Hodges,* 248 Va. 254, 448 S.E.2d 592, 596 (1994)); *see also Brown, supra,* 18 F.3d at 249. "[W]hile it is true that FELA imposes on the railroad carrier a duty to take reasonable precautions to inspect the workplace and protect its employees from possible danger, the plaintiff still carries the burden of proving some act of negligence by the carrier." *Deans, supra,* 152 F.3d at 330 (citing *Brown, supra,* 18 F.3d at 249; *Hurley v. Patapsco & Back Rivers R.R. Co.,* 888 F.2d 327, 329 (4th Cir.1989)). Indeed, "[a]n employer's antecedent negligence must first be established before an inquiry into causation is even warranted." *McMillan, supra,* 648 A.2d at 432.

 Nonetheless, getting the case to a jury in a FELA case poses an easier burden on the plaintiff than in an ordinary negligence case. "Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957);[10] *see also Gottshall, supra,* 512 U.S. at 543, 114 S.Ct. 2396. Therefore, "a relaxed standard of causation applies under FELA." *Gottshall, supra,* 512 U.S. at 543, 114 S.Ct. 2396. "Ordinarily, foreseeability is a question of fact for the jury unless the circumstances of the injury 'are so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" *Seeberger, supra* note 10, 982 P.2d at 1153 (citation omitted).

*The Directed Verdicts*

The trial court granted directed verdict motions in favor of Amtrak three times during the course of the trial. The first one struck the "failure to train or instruct" claim after Mr. Keranen completed his opening statement because he failed to specify or sufficiently delineate it. Mr. Keranen objected to the striking of his "failure to train or instruct" claim. On appeal, he contends that the trial court was familiar with this claim, as indicated in the pretrial order.[11] Further, he argues that the trial court failed to look to the "sum" of the allegations set forth in the pleadings and opening statement as required before deciding whether a claim was stated. He relies on *Hentz v. CBI–Fairmac Corp.,* 445 A.2d 1004, 1005 (D.C.App.1982).

In response, Amtrak does not challenge our holding in *Hentz,* but argues that the negligent training claim is irrelevant to the case because the gravamen of Mr. Keranen's complaint was that he was injured because of a defective door. Moreover, Amtrak contends that Mr. Keranen never sufficiently alleged a cause of action for negligent training.

 In reviewing Mr. Keranen's "failure to train or instruct" claim, we must "view [his] opening statement in conjunction with the complaint." *Id.* at 1005 (citing *Hudson v. Ashley,* 411 A.2d 963, 967 (1980)). "'Since the opening statement may be waived entirely, grave doubt arises whether, if a complaint states a cause of action, an opening statement can so dilute the formal pleading as to afford a basis for summary disposition.'" *Id.* (quoting *Lampka v. Wilson Line of Washington, Inc.,* 117 U.S.App.D.C. 55, 56, 325

10. *See also Seeberger v. Burlington Northern R. Co.,* 138 Wash.2d 815, 982 P.2d 1149, 1152 (1999): "The Supreme Court undoubtedly meant to refer to a 'breach of duty owed by the employer to the employee,' rather than 'employer negligence.'"

11. The record does not include the pretrial order. In granting Amtrak's directed verdict motion, the trial court specifically stated that this matter had been considered during the pretrial conference, and further, said that: "Relative to his lack of training to meet an emergency situation of this nature, you have not in any way indicated that that is a claim that you have."

F.2d 628, 629 (1963)). Moreover, "equitable considerations require that litigants not be denied their day in court merely because they fail to allege in their opening statements that which is sufficiently alleged in their pleadings." *Id.*

Here, Mr. Keranen did not mention anything about the negligent training claim in his opening statement. In addition, the only reference to the training claim in his complaint is found in paragraph six where he states that Amtrak "failed to ... arrange for appropriate ... training prior to [his] accident; and that as a result of this negligence and carelessness on the part of [Amtrak] and its agents, [he] was caused to suffer severe and permanent injuries." This allegation is a conclusory statement with no factual basis. "To allege negligence, a complaint cannot merely make conclusory assertions but must specify a negligent act and 'characterize the duty whose breach might have resulted in negligence liability.'" *District of Columbia v. White*, 442 A.2d 159, 162 (D.C.1982) (quoting *Kelton v. District of Columbia*, 413 A.2d 919, 922 n. 5 (D.C. 1980)). Even under our liberal rule of pleading, to be sufficient, a complaint must "fairly put[ ] the defendant on notice of the claim against him." *Nelson v. Covington*, 519 A.2d 177, 178 (D.C.1986) (citing *Scott v. District of Columbia*, 493 A.2d 319, 323 (D.C.1985) and Super. Ct. Civ. R. 8 (a) and (e)). Neither Keranen's complaint nor opening statement assert a causal relationship between the alleged negligent training and the accident which allegedly resulted in his knee injury. *See Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988) (setting forth elements of negligence). On this record, we find no error in the trial court's dismissal of the claim after opening statement. *See Hentz v. CBI–Fairmac Corp.*, 445 A.2d 1004, 1005 (D.C.1982) (citation omitted).

The second and third directed verdicts concerned Mr. Keranen's safe workplace claim. His theory of Amtrak's failure to provide a safe workplace has not been argued consistently in this litigation. In his complaint he alleged that "the car [4726] was defective and caught fire"; and that Amtrak "failed to inspect, find, repair and warn [him] of this dangerous condition." His opening statement at trial expressed the theory that: (1) "the door [to the ladies' lounge] was very heavily sprung and it kicked [him] backward" or that the door "was hard to open [because]—[it] was too heavily sprung"; (2) car 4726 had experienced "a lot of electrical problems"; and (3) "there was no smoke detector on [car 4726 and] Amtrak cars do not have smoke detectors." [12] Mr. Keranen testified that (1) the ladies' lounge door was "extremely heavily sprung" and "was springed too close and closed real tight"; (2) there was an "electrical fire"; and (3) Amtrak failed to inspect and repair car 4726. In his brief on appeal, he argues that: (1) the ladies' lounge door "was difficult to open" and "over-sprung"; (2) car 4726 was not equipped with a smoke detector, and (3) Amtrak failed to inspect and correct problems noted by him in the "Map 21" book.

After the close of Mr. Keranen's evidence, the trial court granted Amtrak's second motion for a directed verdict pertaining to Amtrak's alleged failure to provide a safe workplace, as evidenced by a "heavily sprung" ladies' lounge door. Mr. Keranen contends that his testimony at trial, in which he stated that Amtrak failed to inspect and repair the "heavily sprung" door to the ladies' lounge, presented more than a "scintilla of evidence" to allow his claim to go to the jury. *See Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, 809 (6th Cir.1996).

12. During a bench conference, Mr. Keranen's counsel acknowledged that some of the train cars on the Montrealer had smoke detectors.

In response, Amtrak contends that Mr. Keranen failed to establish what the applicable standard of care was for the amount of tension required on the hinge of a door. Amtrak further argues that Mr. Keranen provided no evidence whatsoever that would have informed jurors of the nature and frequency of inspections recommended or required, the nature and frequency of inspections actually performed, and any resultant actions taken or which should have been taken.

■ In approaching this difficult issue, we must keep in mind the standard of review for FELA cases: "Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers, supra,* 352 U.S. at 506, 77 S.Ct. 443. This standard is applied in FELA cases because "Congress vested the power of decision ... in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Id.* at 510, 77 S.Ct. 443. In this regard, FELA cases are unlike ordinary negligence cases since "jury verdicts for the plaintiff can be sustained upon evidence that would not be sufficient in the ordinary negligence action." *Fogg, supra,* 585 A.2d at 793 (citing PROSSER AND KEETON ON TORTS § 80 at 578–79 (1984 ed.)).

■ Nevertheless, a railroad employee's conclusory assertions that his or her workplace was unsafe is "not sufficient to survive a motion for a directed verdict." *Hurley, supra,* 888 F.2d at 329. There is more in this case than a conclusory allegation. Mr. Keranen testified that upon inspecting car 4726 prior to its departure for Montreal, he "noted the door was extremely heavily sprung in the ladies lounge." He made a written entry to this effect in Amtrak's Map 21 book for car 4726. In doing so, he noticed that "[t]he door had been previously ... written up." When he inspected the car before the return trip to the District, he found that the door had not been repaired. Ms. Eby testified that inspections are required to be made before the train leaves for a destination and before the return trip. Upon discovery of the smoke coming from the ladies' lounge, Mr. Keranen crouched down, pushed the door open with both hands, then kept his left hand on the door, but shifted his right hand to the door jamb. Upon seeing the red glow on the floor and the rapidly building smoke, he "let go of the door and turned and when [he did], [his] right knee hit very hard the door jamb." He asserted that the door "was springed too close and closed real tight. It was constantly pressing against [him]." Mr. Keranen's co-worker, Ms. Tyler, visited the ladies' lounge shortly before the fire broke out. She testified that the door was difficult to open.

This evidence might not be sufficient to reach the jury in an ordinary negligence case without expert testimony regarding a tightly sprung door. In this type of FELA case, however, jurors could infer, with reason, if they believe the testimony of Mr. Keranen and Ms. Tyler, that the door had a problem with its spring, was difficult to open, and that Amtrak breached its "duty to take reasonable precautions to inspect the workplace and protect its employees from possible danger" when it failed to make appropriate repairs to the door after Mr. Keranen made a pre-injury notation in the Map Book, thus providing at least constructive knowledge to Amtrak of the problem with the door. *Deans, supra,* 152 F.3d at 330. The structure of a door to a ladies' lounge on a train is not so complex as to be beyond the common knowledge of jurors, and two Amtrak employees with considerable experience with such doors testified that the door in question had a very unusual degree of tension in its operation. The ladies' lounge door is not comparable to highly technical machinery where expert testimony is essential to an understanding of its operation. *See*

*Hurley, supra,* 888 F.2d at 329 (directed verdict for employer affirmed where plaintiff presented no expert testimony "regarding the proper lighting conditions for safe operation of a Reed–Prentice lathe").

Moreover, because "a relaxed standard of causation applies under FELA," *Gottshall,* 512 U.S. at 543, 114 S.Ct. 2396, a jury could reasonably conclude, even if its role might have been "slight," that the tightly sprung door played a part in Mr. Keranen's knee injury.[13] *See Chicago Rock Island and Pacific R. Co. v. Melcher,* 333 F.2d 996, 999 (8th Cir.1964) ("The duty of the carmen to inspect was, on [the employee's] evidence, one which was to be performed during the time the train was located in the station. Thus the jury could properly find that the situation was one of breach of duty and fault with which [the railroad] was chargeable, and that this had played a causal part in the accident involved, in that, except therefor, [the employee] would not have had to engage in the efforts to get the door closed at the time and his injury would not have occurred."). In addition, a jury could reasonably conclude that, under FELA, Amtrak could have foreseen that someone who tried to enter or exit a door that was difficult to open, because of a problem with its spring mechanism, could be injured if the door closed too quickly. Indeed, based on Mr. Keranen's testimony, and viewing the evidence in the light most favorable to Mr. Keranen, as we must in a challenge to a directed verdict, we cannot say that this is one of those "infrequent cases where fair-minded jurors [could] not honestly differ whether fault of the employer played any part in [Mr. Keranen's] injury." *McMillan, supra,* 648 A.2d at 436.[14] Nor can we say that the issue of foreseeability of injury should be removed from the jury because in this case "the circumstances of the injury 'are so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" *Seeberger, supra* note 10, 982 P.2d at 1153. Indeed, "[t]he test of foreseeability does not require that the negligent person should have been able to foresee the injury in the precise form in which it in fact occurred. Rather, it is sufficient if the negligent person might reasonably have foreseen that an injury might occur." *Green v. River Terminal Ry. Co.,* 763 F.2d 805, 808 (6th Cir.1985) (citing *Miller v. Cincinnati New Orleans & Texas Pac. Ry. Co.,* 203 F.Supp. 107, 113 (E.D.Tenn.1962), *aff'd* 317 F.2d 693 (6th Cir.1963)). Consequently, we conclude that the trial court erred in directing a verdict in favor of Amtrak on Mr. Keranen's safe workplace claim, insofar as it concerned a too tightly sprung door and Amtrak's failure to inspect and repair the door. *See Eggert v. Norfolk & Western Ry. Co.,* 538 F.2d 509, 511–12 (2d Cir.1976) ("district court failed to apply [FELA jury] test with the breadth and liberality required by the controlling authorities"; "plaintiff's evidence consisted, in the main, of his own testimony at trial.").

Mr. Keranen argues that the trial court erred in granting Amtrak's motion for a

---

13. "It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." *Summers v. Missouri Pacific R. System,* 132 F.3d 599, 606 (10th Cir.1997).

14. Some courts substitute "minimal" for the "slight" evidentiary standard in FELA cases. *See for example Lauria v. National R.R. Passenger Corp.,* 145 F.3d 593, 596–97 n. 2 (3d Cir.1998) ("A trial court is justified in withdrawing FELA issues from the jury's consideration only in those extremely rare instances where there is zero probability either of employer negligence or that any such negligence contributed to the injury of an employee.") (citation and internal quotations omitted). Other courts focus on whether there is a "scintilla" of evidence or "more than a scintilla." *See Aparicio v. Norfolk & Western Ry. Co.,* 84 F.3d at 809. The focus on "substantial" evidence in *Brown, supra,* 18 F.3d at 248, apparently is designed to track the "more than a scintilla" of evidence standard set forth in *Brady, supra,* 320 U.S. at 479, 64 S.Ct. 232. *Brady* was decided in 1943, before the Supreme Court articulated the "slight" evidence rule.

directed verdict relating to negligence based on the lack of a smoke detector in car 4726, and further erred in excluding evidence relating to that claim. Amtrak maintains that there was no error because there is no regulatory requirement that trains have a smoke detector on all cars.

The trial court ruled that Mr. Keranen could produce evidence showing "that there was no smoke detector." However, Mr. Keranen was required to prove "that there is a duty ... to have the smoke detector and that the absence of the detector equals negligence." Furthermore, "[h]e must prove by evidence that, in fact, a prudent individual would have put in a smoke detector in a sleeping car or any sort of railroad car." In response to the court's request for a proffer, Mr. Keranen stated that he had two witnesses. The first witness mentioned was "a Supervisor with Amtrak in the Administrative Services [and the former] Chief of Onboard Crew Services." According to Counsel for Mr. Keranen, Mr. Morris "stated that he would like to see a smoke detector on every car." The trial court rejected this proffer as insufficient because it was couched in terms of what the Supervisor "would like to see." Counsel for Mr. Keranen also proffered the testimony of Mr. Keranen: "[W]e will have the Plaintiff testify that had there been a smoke detector, he would have vacated the car and he would have become aware of the fire much earlier." The trial court also appeared to reject this proffer because it was insufficient and asked: "Who is your expert who will say that the standard of a prudent carrier is to have smoke detectors in each car?" When counsel for Mr. Keranen took the position that the issue of negligence, due to the lack of smoke detectors, was one for the jury, the trial court disagreed.

Later during the trial, counsel for Mr. Keranen asked to make another proffer relating to smoke detectors. He stated that Ms. Eby would testify that "she had made complaints and had petitioned Amtrak to have smoke detectors put on the cars as part of her safety duties." Again, the trial judge asked for "an expert who will testify that a prudent carrier has smoke detectors." When counsel responded that he had no expert, the testimony was disallowed.

▬▬▬ We agree with Mr. Keranen that negligence may be found under FELA even though there are no regulations requiring smoke detectors on every train car. See *Failing v. Burlington Northern R.*, 815 P.2d 974, 977 (Colo.App. 1991). However, the plaintiff in a FELA case has the burden to show some act of negligence on the part of the railroad. In this case, the sum total of the evidence on smoke detectors proffered by counsel for Mr. Keranen was that one Amtrak supervisor "would like to see a smoke detector on every car"; that another Amtrak employee who performed safety duties had complained and petitioned to have smoke detectors put on the cars; and that Mr. Keranen "would have vacated the car and he would have become aware of the fire much earlier." The proffer concerning both the supervisor and Ms. Eby was insufficient to show either that Amtrak breached its duty to provide a reasonably safe work place, or that there was some evidence of causation, even slight, between the absence of a smoke detector on car 4726, and the injury to Mr. Keranen's knee. Even under the liberal standards applied to FELA cases, this evidence, at most, was speculative and based on conjecture. Indeed, we have found no documents in the record reflecting complaints by Ms. Eby or petitions relating to smoke detectors. Consequently, we see no basis for overturning the trial court's directed verdict with respect to the theory of negligence based on the lack of smoke detectors.

Finally, Mr. Keranen contends that the trial court erred in granting a directed verdict with respect to the theory of negligence based on the alleged electrical fire and further erred in failing to apply the doctrine of *res ipsa loquitur* regarding the

fire. In addition, he argues that the trial court erred in excluding portions of Mr. Eldredge's deposition testimony regarding the origin of the fire.

Mr. Eldredge testified that his crew had difficulty getting to the site of the fire because the "top covering for the floor [to the ladies' lounge] ... was very heavy steel." They used mechanical saws and were able to open up "four or five feet square" of the top covering after about forty-five minutes. He saw "man-made material like particle board." Underneath that was "[m]ore steel." He observed "some still active fire there" and something "like glowing" and "like charring." He also noticed a larger area of "charred hardboard ... still glowing on the edge, the leading edge of that fire," and spotted an "electrically operated" heater. "[T]he wires leading to it had been—the insulation had been burned off. Particle board around the wire insulation had burned itself out ... and was blackened."

In the portion of Mr. Eldredge's deposition that the jury did not hear, he asserted that the fire had started "near or at a baseboard heater," and that the fire was caused by "a short-circuit in [the] heater wires." He was asked: "If anyone from Amtrak had looked at the car once you opened up the floor, could they have seen what caused the fire?" He responded: "I believe so." The trial court struck the question and answer because "that is purely speculative." The testimony as to the origin of the fire was stricken because the Mr. Eldredge "is not qualified to say where it started and where it ended." The court made this determination after reviewing the Mr. Eldredge's training.

In addition to Mr. Eldredge's deposition testimony, Mr. Keranen testified that he saw "[a] lot of scorched or burned up particle board and ... burnt wires" after the firefighters had cut through the ladies' lounge floor. He observed "sparks flying." Ms. Tyler asserted that the firefighters asked that the power be turned off after they began their work, and that she saw

them working on the "electrical wiring." Ms. Eby stated that undercarriage inspections are done before a train leaves its point of origin and prior to the return trip. When asked whether "[a] steel casing is opened for inspection by the train inspectors," Ms. Eby declared: "It is expected of them to do so.... I have seen them do it." Further, she responded, "Yes" to the question: "Is it your testimony that the inspections, both at the origin of a trip and what you described as the turn around point, that the steel casings on the trains are opened and inspected?"

 Even though FELA is to be construed liberally, and "even the slightest" proof of negligence is sufficient to avoid a directed verdict, "the plaintiff still has the burden of proving some act of negligence by the railroad." *Hurley, supra,* 888 F.2d at 329 (citation omitted). The combined testimony of Mr. Keranen's witnesses fails to point to any act of negligence by Amtrak pertaining to the fire under the ladies' lounge of car 4726. First, there was no testimony by a qualified expert witness concerning the origin or cause of the fire. "[T]he weight of authority is that the causes of a fire are proper matter for expert opinion." *See Gichner v. Antonio Troiano Tile & Marble Co.,* 133 U.S.App. D.C. 250, 257, 410 F.2d 238, 246 (1969) (citing Annot., Cause of Fire—Opinion Evidence, 88 A.L.R.2d 230, § 5 (1963)). Furthermore, the rule is well settled that the facts on which an opinion is predicated must permit reasonably accurate conclusions as distinguished from guesswork or conjecture. *See St. Lewis v. Firestone,* 130 A.2d 317, 319 (D.C. Mun. App.1957) (A fire investigator's testimony regarding the origin of a fire improperly admitted when his opinion was conjectural and uncertain.). "The opinion must be in terms of the probable and not of the possible." *Id.* at 319. Second, none of the witnesses cited any act of negligence by Amtrak that related, even remotely, to the fire. Indeed, Ms. Eby, Mr. Keranen's sister who worked at one time as the head of

the Safety Department for Amtrak Auto train, specified that Amtrak normally performed undercarriage inspections before leaving the point of origin and prior to the return trip, and opened and examined steel casings during the inspection. There was no testimony that Amtrak failed to do the undercarriage inspection for the Montrealer on the day of Mr. Keranen's accident, nor that Amtrak knew about any defect or problem in the undercarriage.

Mr. Keranen insists that the trial court should have applied the doctrine of *res ipsa loquitur* to infer negligence on the part of Amtrak. "Ordinarily, [however,] the doctrine of res ipsa loquitur cannot be applied to a fire. Nearly always when the origin of a fire is unknown, it would be manifestly unfair to infer one particular cause, eliminating all others which are just as probable." *Miller v. Elgin Joliet & Eastern Ry. Co.*, 177 F.2d 224, 226 (7th Cir.1949). Nevertheless, Mr. Keranen relies primarily on *Jesionowski v. Boston & Maine R. Co.*, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416 (1947) to press his argument. There, the Supreme Court of the United States held that the *res ipsa loquitur* doctrine was applicable to a railroad derailment case. However, the evidence in that case showed that "at the time of the derailment, splinters and planks were thrown into the air ... Other evidence tended to show that planks and splinters were found on the track." *Id.* at 455, 67 S.Ct. 401. The Supreme Court concluded that a jury could infer that the derailment could be attributed to "the lack of care of the railroad...." *Id.* at 458, 67 S.Ct. 401. In addition, the Supreme Court said: "It would run counter to common everyday experience to say that ... the jury was without authority to infer that either the negligent operation of the train or the negligent maintenance of the instrumentalities other than the switch was the cause of the derailment." *Id.* In *Jesionowski*, there was at least some testimony from which the railroad's negligence could be inferred. In this case, the presence of glowing and charred particle board and burnt wire insulation alone, does not amount to negligence.

Mr. Keranen also points to *Fassbinder v. Pennsylvania R. Co.*, 322 F.2d 859 (3d Cir.1963) where the court applied the *res ipsa loquitur* doctrine to a FELA case involving a defective door mechanism. The evidence in that case, unlike the one before us, established that the mechanism "was defective and its condition was the precipitating cause of the accident which ... would not have happened if the defendant had used proper care with respect to [the mechanism]." *Id.* at 861. Another case on which Mr. Keranen relies is *Pooschke v. Union Pacific R. Co.*, 246 Or. 633, 426 P.2d 866 (1967). In contrast to the case at bar, in *Pooschke*, the plaintiff presented some evidence from which negligence of the defendant could be inferred. Consequently, the court h[e]ld that ... there was evidence that the crane, particularly the band, was defective and that the railroad should have known of such defect. *Id.* at 869.

We have previously said that: *res ipsa loquitur* "is a powerful doctrine which 'should be applied with caution in a negligence action so that the mere happening of an accident will not permit the inference of a defendant's liability.'" *Hailey v. Otis Elevator Co.*, 636 A.2d 426, 428 (D.C.1994) (quoting *Washington Sheraton Corp. v. Keeter*, 239 A.2d 620, 622 (D.C.1968)); *see also Scott v. James*, 731 A.2d 399, 403 (D.C.1999). Based on our review of Mr. Keranen's case, we conclude that he failed to meet the first requirement for invoking the doctrine of *res ipsa loquitur*: "[the occurrence is] of the kind which ordinarily does not occur in the absence of someone's negligence." *Hailey, supra,* 636 A.2d at 428 (quoting *Otis Elevator Co. v. Tuerr*, 616 A.2d 1254, 1258 (D.C.1992) (quoting *Otis Elevator Co. v. Henderson*, 514 A.2d 784, 785 (D.C.1986))). Thus, we cannot fault the trial court's refusal to apply the doctrine of *res ipsa loquitur;* nor its decision to grant a directed verdict favoring

Amtrak on Mr. Keranen's claim of negligence due to an electrical fire.

Accordingly, for the foregoing reasons, we affirm the trial court's directed verdict as to Mr. Keranen's training claim; and affirm its directed verdicts with respect to his safe workplace cause of action relating to the lack of smoke detectors and an alleged electrical fire, but reverse as to his claim of a "too tightly sprung" door to the ladies' lounge and Amtrak's alleged failure to inspect and repair the door and remand for a new trial on that claim.[15]

*So ordered.*

---

15. Mr. Keranen raises additional evidentiary arguments relating to Amtrak's letter of commendation, the record of "defect history" for car 4726, and his prior alcohol use and psychological treatment. As we said in *Phillips v. District of Columbia*, 714 A.2d 768, 776 n. 11 (1998), "some of the issues relating to the challenged rulings may not arise at a retrial or, if they do, [they] may occur in a different evidentiary context. To the extent that we deem appellate disposition to be appropriate at this time, we conclude as follows":

 1. " 'An evidentiary ruling by a trial judge on the relevancy of a particular item is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse.' " *Id.* (quoting *Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990) (citations and internal quotation marks omitted)). Moreover, the trial court has the discretion to assess the probative value and prejudicial effect of the evidence.

2. The trial court did not abuse its discretion in excluding the record of "defect history" of car 4726 since the record was unintelligible in the absence of a competent witness who could identify the document, and explain the cryptic contents. *See Bauman v. Ballard Fish Co.*, 185 A.2d 506, 507 (D.C.1962).