DISTRICT OF COLUMBIA, Appellant,

v.

BERETTA, U.S.A., CORP.,
et al., Appellees.

Bryant Lawson, et al., Appellants,

v.

Beretta, U.S.A., Corp., et al., Appellees.

No. 03–CV–24, 03–CV–38.

District of Columbia Court of Appeals.

Argued En Banc Jan. 11, 2005.
Decided April 21, 2005.

James C. McKay, Jr., Senior Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General for the District of Columbia, were on the brief, for appellant in No. 03–CV–24.

Eric J. Mogilnicki, Washington, with whom A. Stephen Hut, Jr., John Payton, David S. Molot, R. Kevin Bailey, Karen C. Daly, Rachel Zakar Stutz, Michael A. Mugmon, Roderick V.O. Boggs, and Susan E. Huhta were on the brief, for appellants in No. 03–CV–38.

Lawrence S. Greenwald and Michael L. Rice, with whom Thomas E. Fennell, James A. Wilderotter, Paul R. Reichert, Lawrence P. Fletcher–Hill, Catherine A. Bledsoe, Robert E. Scott, Jr., Guido Porcarelli, William M. Griffin, III, Jonann E. Coniglio, Paul F. Strain, M. King Hill, III, James P. Dorr, Sarah L. Olson, John F. Renzulli, Jeffrey M. Malsch, Scott C. Allen, Charles L. Coleman, III, Warwick R. Furr, II, Michael C. Hewitt, Michael J. Zomcik, Robert C. Tarics, Michael Branisa, Gerald F. Ivey, Amanda L. Rixse, Lauren Lacey, Timothy A. Bumann, Paul Schleifman, Jeffrey S. Nelson, and Tina Schaefer were on the brief, for appellees.

Brian J. Siebel, Washington, with whom Dennis A. Henigan was on the brief, as amicus curiae on behalf of the Brady Campaign to Prevent Gun Violence.

Roy T. Englert, Jr., Alan E. Untereiner, Jan S. Amundson, and Quentin Riegel filed a brief as amicus curiae, Washington, on behalf of the National Association of Manufacturers.

James M. Beck, Kansas City, MO, Frank J. Eisenhart, J. Gregory Dyer, Washington, D.C., and Hugh F. Young, Jr., filed a brief as amicus curiae on behalf of the Product Liability Advisory Council, Inc.

Before WAGNER, Chief Judge, TERRY, FARRELL, REID, GLICKMAN, and WASHINGTON, Associate Judges, and PRYOR, Senior Judge.

Opinion for the court by Associate Judge FARRELL.

FARRELL, Associate Judge:

The District of Columbia and nine individual plaintiffs appeal from the dismissal of their suit against manufacturers or distributors of firearms alleging common-law negligence and public nuisance, as well as strict liability under D.C.Code § 7–2551.02 (2001). The trial court entered judgment on the pleadings for the defendants on all counts, ruling in substance that the counts of negligence and public nuisance failed basic tests of duty, foreseeability, and remoteness as pleaded; that the District of Columbia could not bring an action under § 7–2551.02; and that, as to the individual plaintiffs, the statutory tort was insufficiently pleaded and, in any event, is an unconstitutional exercise of extra-territorial regulation by the Council of the District of Columbia.

We reverse the dismissal of the statutory count as to the individual plaintiffs, holding that they may advance to discovery on strict liability notwithstanding the difficulties of proof they may confront. We also reverse the dismissal of that count as to the District of Columbia to the extent—but only the extent—that it seeks subrogated damages as to named individual plaintiffs for whom it has incurred medical expenses. Otherwise we sustain the judgment of the trial court, holding that none of the plaintiffs has stated a valid claim of common-law negligence and that the District has not stated a claim of public

nuisance on the facts alleged.[1]

## I. Background

This is the second time in the District of Columbia that an actionable link has been attempted to be drawn between the manufacture or distribution of firearms and the criminal use of those weapons to kill or injure. *See Delahanty v. Hinckley*, 564 A.2d 758 (D.C.1989) (on certified question from federal court, finding no common law basis on facts alleged for holding handgun manufacturers and their officers liable under D.C. law for criminal use of gun by John W. Hinckley, Jr.). The plaintiffs in the present case are the District of Columbia government and nine individual persons who themselves were wounded or represent decedents shot and killed by persons unlawfully using firearms in the District of Columbia.[2] The defendants are numerous manufacturers, importers, or distributors of firearms. Underlying all three counts of the complaint are allegations that may be summarized as follows: Although the District of Columbia itself has stringent gun control laws, there nonetheless exists an unchecked illegal flow of firearms into the District to which the defendants by action and inaction have contributed. This flow of guns takes place in numerous ways, including "straw purchases" (purchases from licensed dealers on behalf of other persons not qualified to buy under applicable law), multiple sales (multiple purchases over a short stretch of time by persons intending to sell or transfer to others not qualified to buy), sales by the defendants to "kitchen table" dealers licensed to sell but who do not do so from retail stores, and gun show sales by sellers who typically lack federal firearm licenses and are not required to do purchaser background checks.

The complaint alleges that the defendants have distributed their firearms without adequate self-regulation or supervision in order to increase firearm sales, knowing or constructively knowing they are creating, maintaining, or supplying the unlawful flow of firearms into the District and similarly knowing those guns will be used to commit crimes such as the ones that have caused death or injury to the individual plaintiffs or persons they represent. The complaint further alleges numerous illustrative means by which the defendants are able to restrict or impede the unlawful flow of firearms into the District but have not done so. These include (to name just three) directing and encouraging their distributors and dealers to refuse to sell in circumstances where the dealer knows or should know that the buyer seeks to make a straw purchase; requiring such dealers to refuse to sell more than one handgun a month to any person not holding a federal firearms license; and requiring their distributors to sell only to "stocking dealers," *i.e.*, retailers who stock guns from retail stores, and not to "kitchen table" dealers or at gun shows.

Based on these general allegations, Count I of the complaint (Strict Liability) alleged that the defendants are liable to the District of Columbia under D.C.Code § 7-2551.02 and related statutes for health care costs, Medicaid expenses, and other costs of assistance and compensation paid

---

**1.** The present opinion by the court en banc supersedes the opinion issued by a division of the court, published at 847 A.2d 1127 (D.C. 2004).

**2.** To illustrate, the complaint alleges that plaintiff Bryant Lawson was shot by a semi-automatic firearm in early 1997 as he tried to flee from three armed men, all of whom were subsequently convicted of aggravated assault or related crimes arising from the shooting. As a result of the shooting, Lawson is a quadriplegic and suffers other ill effects of his disabling injuries.

by the District to or on behalf of victims of gun violence including civilians, police officers, and firefighters, and are liable to the individual plaintiffs for direct and consequential damages proximately caused by the defendants' conduct. Count II (Negligent Distribution) alleged that the defendants breached "a duty to the District and its residents not to create an unreasonable risk of foreseeable harm from the distribution of their firearms, and to take reasonable steps to limit this risk once it had been created." In Count III (Public Nuisance) the District alone alleged that the defendants have "created an ongoing public nuisance of readily available handguns and machine guns that unreasonably interferes with District residents' enjoyment of health, safety, and peace."

## II. Standard of Review

■ The defendants moved for judgment on the pleadings as to all counts, Super. Ct. Civ. R. 12(c), and the trial court granted the motion and dismissed each count for failure to state a claim for which relief can be granted. Rule 12(b)(6); *see Osei–Kuffnor v. Argana,* 618 A.2d 712, 713 (D.C.1993) (standards same for dismissal under Rule 12(b)(6) and judgment under Rule 12(c)). In reviewing that decision, this court "conducts a *de novo* review of the record, construing all facts and inferences in the light most favorable to the plaintiff[s] and taking the complaint's allegations as true." *Duncan v. Children's Nat'l Med. Ctr.,* 702 A.2d 207, 210 (D.C. 1997). A complaint may not be dismissed because the court merely "doubts that [the] plaintiff[s] will prevail on a claim," *id.* (citation omitted), but "dismissal for failure to state a claim may properly be granted where it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [the] claim which would entitle [them] to relief." *Id.* (citation and quotation marks omitted).

Applying these standards, we consider first the two common-law counts alleged, then the statutory count as it relates to each of the two classes of plaintiffs.

## III. Negligent Distribution

■ The trial court dismissed the count of negligent distribution primarily on the basis of *Delahanty, supra.* That decision, unless overruled, indeed appears to bar the plaintiffs' attempt to plead negligence for harm resulting from the unlawful actions of third parties. *Delahanty* came before a division of the court as a certified question from the United States Court of Appeals asking "whether, in the District of Columbia, 'manufacturers and distributors of Saturday Night Specials may be strictly liable for injuries arising from these guns' criminal use.'" *Delahanty,* 564 A.2d at 759 (citation omitted). The panel's answer to that question ranged more widely, however. It pointed out that, although "[t]he certifying court focused on whether this court would adopt the strict liability theory described in *Kelley* [*v. R.G. Indus.,* 304 Md. 124, 497 A.2d 1143 (Md.1985) ]," that court noted that " 'the theoretical underpinnings [of *Kelley* ] are somewhat unclear' and that the certified question was not intended to restrict this court to a particular rationale for this cause of action." *Delahanty,* 564 A.2d at 760 (citation omitted). Further, because this court is "not limited to the designated question of law [in any event] but may 'exercise our prerogative to frame the basic issues as we see fit for an informed decision,' " and because the *Delahanty* appellants were not relying "exclusively on the *Kelley* theory but have continued to advance in this court all the theories in their complaint," we "expand[ed] our inquiry to include the question whether established theories of tort law in the District of Columbia provide a cause of action against gun manufacturers

and distributors for injuries arising from the guns' criminal uses." *Id.* (citation omitted).

Just as the federal District Court had dismissed the entire complaint for failure to state a claim, this court "reject[ed] each of the theories appellants have advanced in the federal courts and in this court." *Id.* We rejected first their theory of strict liability for sale of a defective product, based not on a claim of defective design or manufacture—no such claim was advanced—but on the assertion "that the manufacturers had a duty to warn of the dangers of criminal misuse of the gun." There is no duty to warn, we answered, when a potential danger is known and recognized, and "[b]ecause hazards of firearms are obvious, the manufacturer had no duty to warn." *Id.* (citing *inter alia* RESTATEMENT (SECOND) OF TORTS § 402A cmt. j). We paused only slightly longer over the appellants' attempt to apply the theory of "abnormally dangerous activity," *see* RESTATEMENT §§ 519, 520, to the marketing of handguns. That cause of action, we explained,

> applies only to activities that are dangerous in themselves and to injuries that result directly from the dangerous activity. The marketing of a handgun is not dangerous in and of itself, and when injury occurs, it is not the direct result of the sale itself, but rather ... of actions taken by a third party.

*Delahanty,* 564 A.2d at 761 (citation and quotation marks omitted). We again emphasized that "any likelihood that ... harm will be great ... would result from the use, not the marketing as such, of handguns." *Id.* And we rejected for similar reasons the "social utility" theory of tort adopted by the Maryland courts in *Kelley, supra*—"requiring proof that the danger of the product outweighs its social utility and that no legislative imprimatur

be associated with the product to the contrary," *id.*—pointing out, among other things, that the appellants' attempt to make actionable the manufacture or distribution of "a certain class of inexpensive and allegedly unreliable handguns" (*i.e.,* Saturday Night Specials) ignored the fact that "[a]ll firearms are capable of being used for criminal activity." *Id.* at 761–62 (citation and internal quotation marks omitted).

Finally, we rejected the cause of action for negligent manufacture or distribution, explaining:

> "In general no liability exists in tort for harm resulting from the criminal acts of third parties, although liability for such harm sometimes may be imposed on the basis of some special relationship between the parties." *Hall v. Ford Enters., Ltd.,* 445 A.2d 610, 611 (D.C.1982); *see also Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 141 U.S.App. D.C. 370, 375–76, 439 F.2d 477, 482–83 (1970) (relationships giving rise to a duty of protection include landlord to tenant, school district to student, employer to employee, and hospital to patient); *District of Columbia v. Doe,* 524 A.2d 30, 32 (D.C.1987) (school to student). We are not inclined to extend the rationale of these decisions to the present case. Appellants have alleged no special relationship with the gun manufacturers and have suggested no reasonable way that gun manufacturers could screen the purchasers of their guns to prevent criminal misuse.

*Delahanty,* 564 A.2d at 762.

■ Although our rejection of liability in *Delahanty* rested throughout on the absence of a direct link between the manufacture or distribution of handguns and injuries caused by the criminal misuse of those weapons, it is especially the refusal "to extend the rationale of [our] decisions"

to the negligence theory alleged there that the plaintiffs must confront in asserting their claim of negligent distribution here. They first argue that the negligence discussion in *Delahanty* was *dictum* given the precise phrasing of the D.C. Circuit's question. The fact, however, that we "expand[ed] our inquiry"—as the certifying court foresaw we might—to render "an informed decision" on the reach of "established theories of tort law in the District of Columbia," *id.* at 760, does not make our analysis of any of those theories advisory. That reasoning would make an entire subset of answers to certified questions—*i.e.*, those in which we exercise the "latitude" given us to "consider[ ] nondesignated questions and [to] reformulat[e], if necessary, ... [the] questions as certified," *Penn Mut. Life Ins. Co. v. Abramson*, 530 A.2d 1202, 1207 (D.C.1987)—non-binding *dicta*, contrary to our law that such answers are "*stare decisis* of this court." *Id.*

At bottom, the plaintiffs argue that *Delahanty* was wrongly decided, because, contrary to its holding, District of Columbia law requires no "special relationship between the parties" (such as that of landlord and tenant) to permit liability in negligence for criminal acts of others, so long as the defendant realized or should have realized the likelihood that his negligent conduct would cause foreseeable harm to the plaintiffs. Sitting en banc, we decline this invitation to overrule *Delahanty*. And we pass over the question whether a "special relationship" between a plaintiff and a defendant must undergird any claim of negligence in the District based on harm

stemming directly from the criminal acts of third persons. *But see Workman v. United Methodist Comm.*, 355 U.S.App. D.C. 131, 135, 320 F.3d 259, 263 (2003) (surveying this court's decisions and concluding that under them "the requirement that the defendant [has] been able to foresee that a third party would likely commit a criminal act ordinarily has, and perhaps must have, a relational component"). We nevertheless conclude that our decisions addressing general tort concepts of duty and foreseeability do not permit recognition of a claim for common-law negligence on the facts alleged here.

■ Where an injury is caused by the intervening criminal act of a third party, this court has repeatedly held that liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent. In such a case, the plaintiff bears the burden of establishing that the criminal act *was so foreseeable that a duty arises to guard against it.* Because of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown.

*Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C.1997) (citations and internal quotation marks omitted; emphasis added). In this context, then, the requisite duty of care required for negligence[3] is a function of foreseeability, arising only when foreseeability is alleged commensurate with "the extraordinary nature of [intervening] criminal conduct." *Id.*[4] And, as

---

3. "[T]o establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C.2001) (citations and internal quotation marks omitted).

4. In *Workman*, the D.C. Circuit noted the theoretically somewhat anomalous blending of duty and foreseeability in this court's decisions ("Ordinarily, the relationship between the parties is the key to determining whether the defendant had a legally enforceable duty to the plaintiff (or her decedent), whereas foreseeability is important to issues of proxi-

we further stated in *Potts*, "[o]ur opinions have made clear *the demanding nature of the requirement of 'precise' proof of a 'heightened showing of foreseeability'* in the context of an intervening criminal act involving the discharge of weapons." *Id.* (citations omitted; emphasis added). The high-water mark, as it were, of a showing of facts sufficient to create a duty to protect against such conduct was in *District of Columbia v. Doe*, 524 A.2d 30 (D.C.1987), where the claim was that reasonable protective measures by the District of Columbia could have prevented a child from being raped at a District elementary school. Acknowledging the requirement of a heightened showing of foreseeability in that context, *id.* at 33, we nonetheless identified evidence specific to that school and surrounding area that "could be viewed by reasonable factfinders as enhancing the foreseeability of danger from intruders, thereby creating a duty on the part of District officials to protect the students from this type of criminal activity." *Id.* at 34.[5] In three succeeding cases, by contrast, we rejected liability as a matter of law where foreseeability (hence duty) was not limited by any evidentiary reference to a precise location or class of persons.

In *Clement v. Peoples Drug Store*, 634 A.2d 425 (D.C.1993), in which an employer was sued for negligence arising from the shooting death of one of its employees in the store parking lot, "the only evidence presented with respect to [the] shooting's foreseeability was an expert's opinion based on police reports of criminal activity in the surrounding area. No evidence was introduced involv[ing] any gun-related incidents at the particular shopping mall in which the shooting occurred." *Potts*, 697 A.2d at 1252 (summarizing basis for *Clement*'s holding). In *Bailey v. District of Columbia*, 668 A.2d 817 (D.C.1995), where the plaintiff was shot after attending a cheerleading competition at a junior high school as she was leaving the building, she offered the affidavit of witnesses who asserted that the neighborhood around the school was a "high drug area" and that shootings and other criminal acts had taken place there. Rejecting this showing as insufficient, we explained that "[a]lthough the occurrence of shootings in, and in the vicinity of, the District's public schools is an unhappy reality, ... such 'generic information,' by itself, does not create a duty on the part of the District to protect against the use of firearms under the circumstances presented here." *Id.* at 820.[6] Finally, in *Potts, supra*, the plaintiffs were injured by gunshots from an unknown source as they were leaving the Washington Convention Center (WCC) after attending a boxing event organized by Spencer Promotions, Inc. They sued the organizer and (among others)

---

mate causation and conformity to the standard of care, issues that arise only after a duty has been found."), but that nevertheless "the D.C. courts have repeatedly spoken of the heightened foreseeability requirement in terms of duty." 355 U.S.App. D.C. at 137, 320 F.3d at 265. We see no need to reconsider that framework of analysis in this case.

5. In particular, there was evidence that "crimes against persons [had been committed] in and around the school ... [including] a robbery on the school's playground; sexual assaults and other violent activity [had oc-

curred] in the surrounding area"; and the school security system was defective due to an open rear gate, doors that would not lock, and a malfunctioning intercom, permitting "adult males [to] freely roam[ ] throughout the school." *Doe*, 524 A.2d at 34.

6. In particular, "there was no evidence of prior gun-related violence or assaults occurring at the school or [even] at any of the many cheerleading competitions that had been held anywhere in the city." *Bailey*, 668 A.2d at 821.

the District of Columbia for negligence. Relying principally on *Bailey* and *Clement*, we sustained a grant of summary judgment because "plaintiffs [had] proffered no evidence of any prior gun-related violence at any other event held at the WCC or promoted by Spencer Promotions, nor any other specific evidence bearing directly on the foreseeability of the shooting incident at issue here." 697 A.2d at 1252.

■ *Potts*, *Bailey*, and *Clement* were decided on summary judgment rather than a motion to dismiss, but they demonstrate the tight boundaries—requiring " 'precise' proof of a 'heightened showing of foreseeability," ' *Potts*, 697 A.2d at 1252—within which a claim of common-law negligence must be framed in this jurisdiction "in the context of an intervening criminal act involving the discharge of weapons." *Id.* The plaintiffs in this case broadly allege a duty and foreseeable harm to "the District [of Columbia] and its residents." Complaint, ¶ 151. That duty is unlike even the one claimed to be owed subclasses of residents (shoppers at a particular store, children at a given school, attendees of a particular event) regarding whom we have repeatedly said that "generic" proffers of foreseeability do not suffice to create a duty of care. The class to whom the defendants allegedly owed a duty here is potentially unlimited except by the population of the District of Columbia, any member of which could be a shooting victim. That indeterminacy, as other courts have

recognized, results from the sheer number of ways in which firearms, despite any reasonable precautions manufacturers can be expected to take, may reach the hands of criminal wrongdoers—the sheer number of causal links, in other words, between the licensed manufacture and distribution of firearms and their use to kill or injure others. This court's decisions, we conclude, do not permit recognition of a common-law tort resting on such limitless notions of duty and foreseeability. *See also Lacy v. District of Columbia*, 424 A.2d 317, 320–21 (D.C.1980) (citation and internal quotation marks omitted) (recognizing, as a matter of "policy," the existence in our law of "various liability-limiting considerations which relieve the defendant of liability for harm he actually caused where the chain of events appears highly extraordinary in retrospect").[7]

Among courts rejecting claims of negligent distribution of firearms similar to the plaintiffs', the New York Court of Appeals in *Hamilton v. Beretta, U.S.A., Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001), *leave to appeal denied*, 100 N.Y.2d 514, 769 N.Y.S.2d 200, 801 N.E.2d 421 (2003), has provided the most cogent analysis. Like our *Delahanty* decision, *Hamilton* answered certified questions of law from the federal Circuit Court, including whether under New York decisional law, "the defendants owed plaintiffs a duty to exercise reasonable care in the marketing and distribution of the handguns they manufacture." *Id.* at 1059. The federal District Court had "imposed a duty on gun

7. *District of Columbia v. Carlson*, 793 A.2d 1285 (D.C.2002), does not help the plaintiffs. It concerned the District's duty to maintain in working condition traffic signals installed at intersections with pedestrian crosswalks. The main issue was whether the District could reasonably foresee "that a negligent driver might strike a pedestrian crossing the street" when the traffic light was not working. *Id.* at 1290. Unsurprisingly, the court held that it

could, even though the driver technically had "violated a criminal statute" by failing to yield the right of way. *Id.* But we took pains to add that the driver's negligence "was not an intentional act," *id.* at 1291, reflecting our awareness of how very different "the intervening act of another" was in *Carlson, id.* at 1290, from the unforeseeable criminal actions of third parties in *Potts, Bailey,* and *Clement.*

manufacturers 'to take reasonable steps available at the point of ... sale to primary distributors to reduce the possibility that these instruments will fall into the hands of those likely to misuse them.'" *Id.* at 1061 (citation omitted). The New York Court of Appeals rejected that duty as a basis for common-law negligence. Its prior decisions, like this court's, were "cautious ... in extending liability to defendants for their failure to control the conduct of others," a "judicial resistance to the expansion of duty [growing] out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another." *Id.* at 1061. Under the duty imposed by the District Court, by contrast, "[t]he pool of possible plaintiffs is very large—potentially, any of the thousands of victims of gun violence." *Id.* (footnote omitted). Moreover, the court reasoned,

> the connection between defendants, the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer. The chain most often includes numerous subsequent legal purchasers or even a thief. Such broad liability, potentially encompassing all gunshot crime victims, should not be imposed without a more tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs.

*Id.* at 1061–62.

The court therefore rejected the plaintiffs' assertion of "a general duty of care aris[ing] out of the gun manufacturers' ability to reduce the risk of illegal gun trafficking through control of the marketing and distribution of their products," pointing out that to "impos[e] such a general duty of care would create not only an indeterminate class of plaintiffs but also an indeterminate class of defendants whose liability might have little relationship to the [social] benefits of controlling illegal guns." *Id.* at 1063.[8] Although the plaintiffs had "presented [the court] with a novel theory—negligent marketing of a potentially lethal yet legal product, based upon the acts not of one manufacturer, but of an industry—we are unconvinced," the court concluded, that "on the record before us[ ] the duty plaintiffs wish to impose is either reasonable or circumscribed." *Id.* at 1068.

The plaintiffs here point out that *Hamilton* was not decided on a motion to dismiss but only after a trial had shown the absence of proof "that the gun used to harm [the injured plaintiff] came from a source amenable to the exercise of any duty of care that plaintiffs would impose upon defendant manufacturers." *Id.* at 1062. But the plaintiffs in our case do not claim that through discovery they may be able "tangibl[y]" to show "that defendants were a *direct* link in the causal chain that resulted in plaintiffs' injuries," *id.* (emphasis added)—that, in the language of our cases, those injuries were foreseeable to the defendants in the "heightened" sense entailing " 'precise proof' " of knowledge and corresponding ability to prevent required by our decisions. *Potts, supra.* At most the plaintiffs allege that the defendants in the aggregate know that a sizeable number of the firearms they manufacture make their way, through dealer practices

---

8. Another way of viewing it, the court said, was that no evidence had been offered "tending to show to what degree [the plaintiffs'] risk of injury was enhanced by the presence of negligently marketed and distributed guns, as opposed to the risk presented by all guns in society." *Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1062.

they reasonably could limit, into the District of Columbia and into the hands of criminals, sometimes with "only a short time passing between the retail sale of a firearm outside the District and its criminal misuse in the District." Complaint, ¶ 123. Even if, as they claim, discovery may enable them to tie a particular weapon used to kill or injure a named plaintiff or his decedent to a particular manufacturer, they would still not have established a cognizable—*i.e.,* a "reasonable or circumscribed," *Hamilton, supra*—common-law duty to these plaintiffs rather than a duty to the class of all potential victims of gun violence in the District. They would not, in sum, have stated a claim under our decisions for common-law negligence based on injuries resulting from the criminal acts of third parties.

There is an additional reason why we decline to recognize the plaintiffs' claim for common-law negligence in the distribution of firearms. The Council of the District of Columbia has intervened precisely in this area by enacting a strict liability statute governing the manufacture and sale of a subclass of firearms (assault weapons) whose lethal character, in its judgment, outweighs any social utility they may have. *See* D.C.Code § 7–2551.02. Under that statute, as we hold in part V, *infra,* the individual plaintiffs have stated a valid claim (and the District as well may have limited subrogation rights). In analogous circumstances, this court has refused to expand the boundaries of a common-law cause of action in tort. Specifically, in *Carl v. Children's Hosp.,* 702 A.2d 159 (D.C.1997) (en banc), the full court adopted

the tort of wrongful discharge as an exception to the traditional at-will doctrine governing termination of employment, where the discharge violates "a clear mandate of public policy." *Id.* at 164. Although we left future applications of the tort to be decided on a case-by-case basis, we stressed that any such application must be "carefully tethered to fundamental policies" implicit in "statute[s] or municipal regulation[s], or in the Constitution." *Id.* at 164. More important for present purposes, in succeeding cases divisions of the court have declined to apply this cause of action where the policy in question was not implicit—*i.e.,* embodied in some related statute—but rather was "explicit and [might] apply directly" through a statute expressly addressing the matter. *Freas v. Archer Servs., Inc.,* 716 A.2d 998, 1002 (D.C.1998) (rejecting application of *Carl* as unnecessary where suit was based on statutorily banned and actionable retaliation for exercising rights under the Workers' Compensation Act); *see also McManus v. MCI Communications Corp.,* 748 A.2d 949, 957 (D.C.2000) (noting and applying the court's previous rejection of "the argument ... that a public policy exception to the at-will doctrine applies to an alleged statutory violation"). That deference to the legislative role commends itself to us in this case as well. The existence of § 7–2551.02 reinforces our unwillingness to relax ˙ basic "liability-limiting" standards, *Lacy, supra,* of duty, foreseeability, and causal remoteness to recognize the cause of action for common-law negligence the plaintiffs advocate.[9]

---

9. *Cf. also Williams v. Baker,* 572 A.2d 1062, 1072 (D.C.1990) (en banc), where in adopting the zone of danger test limiting the class of persons who may claim negligent infliction of emotional distress, the court explained:

> [T]his jurisdiction should not cast itself adrift on a sea of infinite foreseeability, subject only to such arbitrary limitation as we should impose.... [T]he issue of whether a plaintiff can recover damages for fear of harm to a third person is a question of policy for the court, not one to be determined on a case-by-case determination of whether the injury was foreseeable.

## IV. Public Nuisance

■ Much of what we have said so far explains why we also reject on the pleadings the claim for public nuisance brought by the District of Columbia alone. The RESTATEMENT (SECOND) OF TORTS § 821B (1) (1979) defines that tort as "an unreasonable interference with a right common to the general public." The District argues that this cause of action does not derive from its negligence claim, but is an independent cause of action with distinct elements, namely, (1) an interference with a public right (2) that is unreasonable. Although this court referred to that definition of the tort in *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879 (D.C.1982), the defendants and their amici argue that we have never recognized a public nuisance claim that did not involve either ownership (and control of) real property, criminal violations, or independently tortious conduct such as negligence—none of which is alleged, or sufficiently alleged, in this case.

As an independent tort, claims of nuisance have indeed not been viewed favorably by this court. In recent cases we have even said that "nuisance is a type of damage and not a theory of recovery in and of itself," *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 934 (D.C.1995), so that recovery in such cases, "if at all, [must be] on the theory of negligence," *Bernstein v. Fernandez*, 649 A.2d 1064, 1072 (D.C. 1991) (citation and quotation marks omitted), or another theory such as intentional infliction of emotional distress. *Jonathan Woodner Co., supra.* The District argues that these statements were made in the context of claims for private, not public, nuisance but our decision in *Bernstein* noted that, "for the purpose of our holding in this case," the point did not depend on "whether the alleged nuisance is public or private." *Bernstein*, 649 A.2d at 1072 n. 8.

Even the RESTATEMENT definition explains "nuisance" by "reference to two particular kinds of harm—the invasion of two kinds of interests[, public and private]—by conduct that is tortious *only if it falls into the usual categories of tort liability.*" RESTATEMENT (SECOND) OF TORTS § 821A cmt. c (1979) (emphasis added).

The defendants here do not dispute, however, that a separate tort of public nuisance is cognizable in the District of Columbia, or that the RESTATEMENT provides the appropriate definition: "an unreasonable interference with a right common to the public." We accept the case before us on that basis. The question, nevertheless, is whether the District has sufficiently pleaded that cause of action, and the answer depends critically on how prepared we are to loosen the tort from the traditional moorings of duty, proximate causation, foreseeability, and remoteness that have made us reject the plaintiffs' claim of negligence. For the following reasons, we are not convinced that the public nuisance cause of action the District alleges is sufficiently distinguishable from its negligence claim to justify a different result.

The issue was defined pointedly by the majority and dissenting opinions in *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 761 N.Y.S.2d 192, *leave to appeal denied*, 100 N.Y.2d 514, 769 N.Y.S.2d 200, 801 N.E.2d 421 (2003), where the state's suit for public nuisance essentially mirrored the District's allegations in this case:

> Plaintiff's complaint ... claims that illegally possessed handguns are a common-law public nuisance because they endanger the health and safety of a significant portion of the population; interfere with, offend, injure and otherwise cause damage to the public in the exercise of rights common to all; and that,

after being placed on actual and constructive notice that guns defendants sell, distribute and market are being used in crimes, they have, by their conduct and omissions, created, maintained and contributed to this public nuisance, because they manufacture, distribute and market handguns allegedly in a manner that knowingly places a disproportionate number of handguns in the possession of people who use them unlawfully. Plaintiff further claims that defendants are on notice that certain types of guns, and guns sold in certain locales, are disproportionately used in the commission of crimes.

*Id.* at 194. The dissent in *Sturm, Ruger* took the position that "[a] negligence analysis, with its requirement of the existence of a duty limited by concomitant considerations of proximate cause, foreseeability, fault, intent, and tempered by notions of the equitable apportionment of economic liability, is inapposite to an action for abatement of a public nuisance brought by the state in the proper exercise of its police powers." *Id.* at 208 (Rosenberger, J., dissenting).

The majority rejected that proposition, in large part "based on the reasoning and implications of *Hamilton v. Beretta,* [*U.S.A., Corp., supra*]." *Sturm, Ruger,* 761 N.Y.S.2d at 194. It determined that "much of the Court[ of Appeals'] reasoning in dismissing the *Hamilton* negligent marketing complaint logically, and most aptly, applies to our consideration of this plaintiff's common-law public nuisance claim." *Id.* at 196. In particular, the *Hamilton* court's concern about "potentially limitless liability and about the unfairness of imposing liability for the acts of another" was "common to both negligent marketing and public nuisance claims," because to disregard "the existence, remoteness, nature and extent of any intervening causes between defendants' lawful commercial con-

duct and the alleged harm" would invite "a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities." *Id.* at 196–97. Whereas New York decisions validating public nuisance claims had "involve[d] specific harm directly attributable to defendant or defendant's activity," *id.* at 198 n. 2, the present complaint would "impose[ ] an undefined duty of care on handgun manufacturers and distributors," *id.* at 200, despite the "intervention of unlawful and frequently violent acts of criminals—over whom defendants have absolutely no control—who actually, directly, and most often intentionally, cause the cited harm." *Id.* at 199. The court concluded that the legislative and executive branches were "vastly better suited to address" the "societal problems associated with, or following, legal handgun manufacturing and marketing," "problems which may be as remote from a defendant's conduct and control as these." *Id.* at 203.

We agree with this reasoning, and are similarly unwilling to recognize a claim of common-law public nuisance that disregards, or greatly dilutes, the liability-limiting factors applied in part III, *supra.* The sheer number of causal links, and resulting attenuation, that underlie the District's claim of injury from the defendants' invasion of a public right were described by the Supreme Court of Connecticut in a similar suit brought by the city of Bridgeport:

The manufacturers sell the handguns to distributors or wholesalers and ... those sales are lawful because federal law requires that they be by licensed sellers to licensed buyers. The distributors then sell the handguns to the retailers, sales that, again, are required by federal law to be by licensed sellers to

licensed buyers. The next set of links is that the retailer then sells the guns either to authorized buyers, namely, legitimate consumers, or, through the "straw man" method or other illegitimate means, to unauthorized buyers, sales that likely would be criminal under federal law. Next, the illegally acquired guns enter an "illegal market." From that market, those guns end up in the hands of unauthorized users. Next, either the authorized buyers misuse the guns by not taking proper storage precautions or other unwarned or uninstructed precautions, or the unauthorized buyers misuse the guns to commit crimes or other harmful acts. Depending on the nature of the conduct of the users of the guns, the plaintiffs then incur expenses for such municipal necessities as investigation of crime, emergency and medical services for the injured, or similar expenses. Finally, as a result of this chain of events, the plaintiffs ultimately suffer ... increased costs for various municipal services, ... injuries and deaths of Bridgeport's residents, ... and a negative impact on the ... ability of the residents to live free from apprehension of danger.

*Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98, 123–24 (2001).[10] The court rejected a claim of public nuisance brought by "a plaintiff situated as remotely from the defendants' conduct as these plaintiffs are, or who present[ ] a chain of causation as lengthy and multifaceted as these plaintiffs have." *Id.* at 133.

Other courts likewise have rejected public nuisance as a basis for holding gun manufacturers and distributors liable, either because they found no duty owed to the public at large to prevent guns from ending up in the hands of criminal wrongdoers, or for reasons of attenuation, remoteness, or inability of those defendants to control the nuisance. *See generally Tioga Pub. School Dist. # 15 v. United States Gypsum Co.*, 984 F.2d 915, 920 (8th Cir.1993) ("[L]iability for damage caused by a nuisance turns on whether the defendant is in control of the instrumentality alleged to constitute a nuisance, since without control a defendant cannot abate the nuisance."). The court in *Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A., Corp.*, 273 F.3d 536 (3d Cir.2001), for example, recited "a chain of seven links" necessary to "connect the manufacture of handguns with municipal crime-fighting costs," and held that

[t]his causal chain is simply too attenuated to attribute sufficient control to the manufacturers to make out a public nuisance claim. In the initial steps, the manufacturers produce lawful handguns and make lawful sales to federally licensed gun distributors, who in turn lawfully sell those handguns to federally licensed dealers. Further down the chain, independent third parties, over whom the manufacturers have no control, divert handguns to unauthorized owners and criminal use.

*Id.* at 541. The same court in *City of Philadelphia v. Beretta, U.S.A., Corp.*, 277 F.3d 415 (3d Cir.2002), rejected the city's

---

10. Like the Connecticut complaint, the District's public nuisance claim alleges that the "[d]efendants' ongoing conduct has created an ongoing public nuisance of readily available handguns and machines guns ... that unreasonably interferes with District residents' enjoyment of health, safety, and peace .... As a result of the continued possession and use of these firearms, residents of the District will be killed and injured, and the public will continue to fear for its health, safety, and welfare and will be subjected to conduct that creates a reasonable apprehension of danger to person and property." Complaint, ¶ 164.

attempt "to shorten the causal chain by arguing that the 'thriving illegal market ... injures [it], even before any guns acquired in the illegal market are actually used in the commission of a crime.'" *Id.* at 424. This assertion, the court explained, "does not reduce the links that separate a manufacturer's sale of a gun to a licensee and the gun's arrival in the illegal market through a distribution scheme that is ... lawful" and a succession of unlawful third-party acts (such as straw purchases) "likely [to be] ... long[ ] and ... varied." *Id.* (footnote omitted).

Most recently, the Supreme Court of Illinois unanimously rejected a public nuisance claim by the City of Chicago almost identical to the one made here (unlike in the present suit, the defendant-class there included retail gun dealers as well as manufacturers and distributors). *See City of Chicago v. Beretta, U.S.A. Corp.,* 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099 (2004). Recognizing first that the gun manufacturers and distributors were "highly regulated by state or federal law," the court held that a claim for public nuisance could be brought against them only if, at a minimum, they had negligently conducted their business operations, which in turn presupposed that they owed a duty to the Chicago public "to exercise reasonable care to prevent their firearms from ending up in the hands of persons who use and possess them illegally in the City of Chicago." *Id.* at 1109. The court found no such "duty [of the manufacturers and distributors] owed to the public at large," explaining:

> It is reasonably foreseeable, in a nation that permits private ownership of firearms, that criminals will obtain guns and it is not only likely, but inevitable, that injuries and death will result. It is less foreseeable to these defendants that the criminal conduct of individuals who illegally take firearms into a particular community will result in the creation of a public nuisance there. Further, despite plaintiffs' suggestion that the only burden they would place on defendants is the loss of sales to criminals, the magnitude of the burden that plaintiffs seek to impose on the manufacturer and distributor defendants by altering their business practices is immense. Finally, plaintiffs predict only positive consequences if this duty is recognized—the city will be safer and lives will be saved. *Such positive consequences are speculative at best, being based on the assumption that criminals will not be able to obtain guns manufactured by other companies and sold by other dealers.* The negative consequence of judicially imposing a duty upon commercial enterprises to guard against the criminal misuse of their products by others *will be an unprecedented expansion of the law of public nuisance.*

*Id.* at 1126 (emphasis added).

Even as to the retail dealer defendants, alleged (*inter alia*) to have sold firearms regularly to Chicago buyers although "the words or behavior of the buyers indicate[d] an intention to use the weapon illegally," *id.* at 1107, the Illinois court rejected the claim that they were the "legal cause" of the public nuisance alleged. The court pointed to "the link between the questions of the existence of a duty and the existence of legal cause" inasmuch as "[b]oth depend on an analysis of foreseeability." *Id.* at 1136. It noted that it was "not faced with the question of whether a gun dealer might be held liable for negligently entrusting a weapon to an individual buyer when it is foreseeable that the buyer might allow a third party to possess or use the gun illegally." *Id.* at 1137. Rather, the "plaintiffs argue that it is foreseeable to these defendants that the aggregate effect of numerous sales transactions occurring

over time and in different multiple locations operated by businesses with no ties to each other will result in the creation of a public nuisance in another city." *Id.* The court responded that "it is not at all clear that [this] condition would cease to exist even if these particular defendants entirely ceased selling firearms":

> The manufacture and sale of firearms is legal. There is a market for these products that is served by thousands of dealers all across the country. The sales that would otherwise have been made by these dealers would be made by others. Ultimately, there would be a shift in market share between these dealers and others and, perhaps, an increase in the price of illegal weapons "on the street" as those intent on illegal ownership had to go further afield in search of weapons to buy.

*Id.* As in the case of the manufacturers and distributors, the court found that "the consequences of imposing a duty upon the dealer defendants to prevent the creation of a public nuisance in the city of Chicago by those intent on illegally possessing and using guns in the city are ... far-reaching." *Id.* at 1138. It concluded:

> [T]he alleged public nuisance is not so foreseeable to the dealer defendants that their conduct can be deemed a legal cause of a nuisance *that is the result of the aggregate of the criminal acts of many individuals over whom they have no control.* This is one of those "instances in which a party may have contributed in some remote way [to the harm] and yet it is inappropriate to subject that party to tort liability."

*Id.* (quoting *Sturm, Ruger,* 761 N.Y.S.2d at 202) (emphasis added; internal quotation marks omitted).

Applied to the manufacturer and distributor defendants before us, we agree with the Illinois court's analysis. The District contends that these defendants are aware of, and in some ways even complicit in, the practices of certain "notorious" gun dealers in the counties surrounding the District of Columbia who sell firearms indiscriminately (particularly through straw sales) to persons they know or should know intend to use or possess them in the District of Columbia. But even assuming that the defendants can be said to exercise some control over the business practices of those independent dealers, the District has not alleged—any more than did the plaintiffs in *City of Chicago*—reason to believe that the exercise of that control would abate the nuisance of guns unlawfully in the hands of persons in the District to any perceptible degree. Deplorable though these facts may be, the ready availability of firearms in the nation at large, and the sheer number and variety of opportunities by which persons intent on acquiring them unlawfully can do so, counsel strong restraint on the part of a court asked to hold defendants—individual or corporate—answerable for a common-law nuisance that "result[s from] the aggregate of the criminal acts of many individuals over whom they have no control." *City of Chicago,* 290 Ill.Dec. 525, 821 N.E.2d at 1138. In keeping with our own decisions and others we have found persuasive, we decline to relax the common-law limitations of duty, foreseeability, and direct causation so as to recognize the broad claim of public nuisance the District has alleged.

In this regard, moreover, what we stated at the end of our discussion of negligence, part III, *supra,* remains pertinent: The legislature, by enacting D.C.Code § 7–2551.02, has eased the liability-limiting elements of traditional tort law to create a cause of action against gun manufacturers and distributors for injuries to individuals caused by a particular class of lethal firearms having little or no social utility. In

these circumstances, we are doubly unpersuaded of the necessity or wisdom of adopting judicially a right of action for public nuisance applied to the manufacture and sale of guns generally, where an effect may be a proliferation of lawsuits "not merely against these defendants[ ] but ... against ... other types of commercial enterprises"—manufacturers, say, of liquor, anti-depressants, SUVs, or violent video games—"in order to address a myriad of societal problems ... regardless of the distance between the 'causes' of the 'problems' and their alleged consequences." *Sturm, Ruger,* 761 N.Y.S.2d at 203.

## V. Strict Liability

In Count I, the plaintiffs all have brought suit under D.C.Code § 7–2551.01 *et seq.* (2001), the Assault Weapon Manufacturing Strict Liability Act of 1990 (the "SLA" or "Act"). The operative provision of the statute, § 7–2551.02, states:

> Any manufacturer, importer, or dealer of an assault weapon or machine gun shall be held strictly liable in tort, without regard to fault or proof of defect, for all direct and consequential damages that arise from bodily injury or death if the bodily injury or death proximately results from the discharge of the assault weapon or machine gun in the District of Columbia.

The SLA defines "assault weapon" to include a number of specific products, and invests "machine gun" with the same meaning defined in D.C.Code § 7–2501.01(10), *i.e.,* "any firearm which shoots, is designed to shoot, or can be readily converted or restored to shoot: (A) Automatically, more than 1 shot by a single function of the trigger; [or] (B) Semiautomatically, more than 12 shots without manual reloading." In enacting the SLA, the D.C. Council understood assault weapons to "include both automatic and semi-automatic weapons," as well as "some handguns and rifles," a class of weapons it found have little or no social benefit but at the same time pernicious consequences for the health and safety of District residents and visitors. *See* SLA § 2(2), D.C. Law 8–263 [Act 8–289], § 2, 37 DCR 8482 (Dec. 28, 1990) (hereafter "Findings").

The trial court dismissed this count as to all defendants, concluding that (1) the statute provides no cause of action to the District of Columbia and (2), in any case, (a) the plaintiffs failed to state a claim within the Act and (b) the SLA is an unconstitutional attempt at extraterritorial regulation, violating both the Commerce Clause and principles of due process. We therefore confront three issues:

A. Does the SLA, or any other statute by implication, give the District of Columbia a right of recovery for liability under the SLA;

B. Did the complaint sufficiently plead the defendants' liability to the plaintiffs under the SLA; and, if so,

C. Does the SLA impermissibly burden interstate commerce or violate due process?

We answer these questions in order.

### A. District of Columbia

"The text of an enactment is the primary source for determining its drafters' intent." *Stevenson v. District of Columbia Bd. of Elections & Ethics,* 683 A.2d 1371, 1376 (D.C.1996) (citation and quotation marks omitted). "In the ordinary case, absent any indication that doing so would frustrate [the legislature's] clear intention or yield patent absurdity, our obligation is to apply the statute as [the legislature] wrote it." *Hubbard v. United States,* 514 U.S. 695, 703, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995) (citation and internal quotation marks omitted); *see also Peoples Drug Stores, Inc. v. District of*

*Columbia,* 470 A.2d 751, 753–54 (D.C. 1983). At the same time, we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them. *See Carey v. Crane Serv. Co.,* 457 A.2d 1102, 1108 (D.C.1983). "Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language . . ., structure, and subject matter." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (citation and internal quotations marks omitted).

■■■ Applying these standards, we hold that the SLA confers a right of action on individuals who are injured, but not the District of Columbia. The statute makes manufacturers and others strictly liable in tort "for all direct and consequential damages that arise from *bodily injury or death* if the bodily injury or death proximately results from the discharge of" one of the enumerated firearms. Section 7–2551.02 (emphasis added). Bodily injury or death self-evidently can happen only to individual persons, not corporate entities. Surrounding provisions of the statute confirm the purpose to give redress to individuals. The statute does "not operate to limit in scope any cause of action, other than that provided by this [subchapter], available to a *person* injured by an assault weapon." Section 7–2551.03(c) (emphasis added). And, it affords no right of action to "a *person* injured by an assault weapon while committing a crime," or to one seeking recovery "for a *self*-inflicted injury" resulting from "a reckless, wanton, or will-

ful discharge of an assault weapon." Section 7–2551.03(b) & (e) (emphases added). The subject of these provisions, then, is a right of action—granted, preserved, or withheld—of individuals, not government, to sue for damages arising from bodily injury or death traceable to assault weapons.[11]

In its brief to the division, the District distinguished between the verb the legislature used—"arise from"—and others it might have used if it meant to restrict the class of those entitled to recover damages to individuals. "Individuals' injuries," the District reasoned, "are the source of the District's damages under the SLA, including the costs of law enforcement and healthcare services that 'arise from' the 'bodily injury or death' of individuals." Br. for D.C. to Div. at 38; *see also* Reply Br. for D.C. to Div. at 23 (claiming a right under the SLA "to recover the expenses that it [has] incurred for law enforcement, health-care services, paid leave of employees, and other services" attributed to gun violence). But one need only consider the magnitude—the unboundedness—of such "damages" to realize the implausibility of the argument that the Council provided for them in the SLA by its choice of a verb and nothing else. "Arise from" may well connote a causal relation less direct and immediate than, say, "result from," but to freight it with a legislative intent to include the vast array of law enforcement costs and governmental health-care services attributable to assault weapon injuries as recoverable under the statute demands far more than the verb alone can

---

11. The legislative findings accompanying the Act reinforce this point, stating (among other things) that the manufacture and distribution of assault weapons "expos[es] the citizens [of] and visitors to the District [of Columbia] to a high degree of risk of serious harm," and "[a]s between the manufacturer or dealer of an assault weapon on the one hand and *the innocent victim* of the discharge of an assault weapon on the other hand, the manufacturer or dealer is more at fault than the victim." Findings (14) & (15), 37 DCR at 8483 (emphasis added).

bear. Neither it nor the addition of "consequential" to the "direct" damages recoverable expands, in our judgment, the class of those given a cause of action by the SLA.

The District asserts, however, an additional and more limited claim for damages that we conclude has validity. The complaint alleges that in addition to the right of action the SLA gives the District (a claim we have rejected), the District may recover under two other statutes the medical and related expenses it has incurred as a result of third-party wrongful conduct. Specifically, D.C.Code § 4–601 *et seq.* (2001), the Health–Care Assistance Reimbursement · Act of 1984 (HCARA), grants the District "an independent, direct cause of action against [a] third party for the unreimbursed value or cost of ... health-care assistance," whenever the District has "provide[d] health-care assistance to a beneficiary who has suffered an injury or illness under circumstances creating liability in [that] third party." *Id.* § 4–602(a). "Beneficiary" means "any individual who has received health-care assistance from the District and, if applicable, that individual's guardian, conservator, personal representative, estate, dependants, and survivors." *Id.* § 4–601(1). Another statute, D.C.Code § 5–601 *et seq.* (2001), the Medical Care Recovery Act of 1978 (MCRA), similarly gives the District a "right to recover" health-care and funeral expenses it has paid for police officers and firefighters, and the costs of their extended absence with pay, from third-parties whose tortious conduct resulted in injuries to those employees. *Id.* § 5–602.

Applied to this case, both statutes effectively give the District rights of "legal subrogation," D.C.Code § 4–602(b), to claims a beneficiary or specified District employee may have against a defendant under the SLA. Relying on these provisions, the complaint alleges that as a proximate result of the defendants' conduct, the District "has incurred and will incur costs that are recoverable under [the HCARA and the MCRA] including: (1) health care costs and Medicaid expenses in treating victims of gun violence ...; (2) costs of care and treatment provided to officers and members of the Metropolitan Police Department and the Fire Department of the District of Columbia [injured by guns] ...; and (3) leave of absence wages and other assistance and compensation paid or to be paid police officers and firefighters ... on account of their having suffered gun injuries." Complaint, ¶ 137. None of the currently named plaintiffs fits the latter two categories, but two appear to fall within the first. Thus, as to the plaintiff Bryant Lawson, the complaint alleges that as a result of injuries he suffered from bullets "most likely ... fired by a 'machine gun' ... manufactured, imported, or sold by one of the [d]efendants," Complaint, ¶ 56, he "relied on Medicaid to pay for the surgery, hospitalization, medications, and rehabilitation he needed because of his gunshot wounds" and he "continues to rely on Medicaid to treat the frequent problems that result from his being a quadriplegic." Complaint, ¶ 58. Regarding a second plaintiff, Gregory Ferguson, the complaint alleges that as a proximate cause of having been struck by bullets from an AK–47–type weapon, he "spent several days in D.C. General Hospital and over a year in physical therapy." As to these individuals, the HCARA authorized the District to "[i]ntervene ... in [this] proceeding brought by the beneficiary," D.C.Code § 4–604(a)(2), to attempt to recover nonreimbursed medical expenses incurred by the District for treatment. It should be viewed as having done so, and

may remain in the case for that purpose.[12]

## B. Rule 12(b)(6)

By its terms, § 7–2551.02 requires proof tying an assault weapon or machine gun that causes death or bodily injury to a particular manufacturer, importer, or dealer ("Any manufacturer, [etc.] of *an* assault weapon ... shall be held strictly liable ... if the bodily injury ... proximately results from the discharge of *the* assault weapon" (emphasis added)). The trial court dismissed the individual plaintiffs' claims under the statute because none of the plaintiffs could identify in the complaint "which defendant and corresponding [machine gun or assault weapon] was involved in their respective injury or death of the relevant decedent." The court acknowledged that "[t]he involvement of a recovered weapon might potentially moot many of the legal deficiencies associated with the plaintiffs' reliance on the [SLA]," but concluded that since "*none* of the individual plaintiffs bases his or her case on weapons that were actually recovered, their claims are pled on pure speculation" (emphasis in original). In our view, requiring the plaintiffs to identify with particularity the weapons that caused their injuries and the manufacturers of those weapons at this early stage of the proceedings is contrary to the usual rules of pleading, and does not justify dismissal under Rule 12(b)(6).

In substance, each individual plaintiff alleged that the injuries of which he or she complains were caused by an assault weapon or a machine gun as defined by the SLA.[13] "Under conventional liberal rules of 'notice' pleading," *West v. Morris*, 711 A.2d 1269, 1271 (D.C.1998); *see* Super. Ct. Civ. R. 8(a), those allegations were sufficient to state a claim because dismissal under Rule 12 is proper only if it is apparent "beyond doubt the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Owens v. Tiber Island Condo. Ass'n,* 373 A.2d 890, 893 (D.C.1977). *See also Diamond v. Davis,* 680 A.2d 364, 371 (D.C.1996) ("Under the Superior Court Civil Rules ... the plaintiff need only plead facts sufficient to put the defendants on notice of the claims brought against them. A plaintiff need not plead his evidence at all.") (internal citation omitted); *Vincent v. Anderson,* 621 A.2d 367, 372 (D.C.1993) (issue of "whether or not appellant[s] had available evidence sufficient to prove the allegations in [their] complaint" "really had nothing to do with the legal sufficiency of the complaint"). The trial court found "no excuse for [each plaintiff's] inability to assert which defendant's weapon was used to harm him, if this fact is knowable at all," but that criticism is premature, as is the court's comment that the defendant manufacturers and distributors "surely have no

---

**12.** Indeed, exercising its additional right to "[i]nstitute and prosecute a proceeding alone (in its own or the beneficiary's name) or in conjunction with the beneficiary" to recover such expenses, D.C.Code § 4–603(a)(3), the District is free to move to amend the complaint in conformity with the rules to include other beneficiaries with claims under the SLA whose identity has come to light during these proceedings.

**13.** For example, the complaint alleged that Andre Wallace, the son of plaintiff Laura Wallace, and Natasha Marsh, the daughter of plaintiff Madilia Marsh–Williams, were shot and killed by three men, at least one of whom was armed with a 9mm pistol. Complaint, ¶ 82. Nine-millimeter bullets were recovered from the bodies of both victims. Complaint, ¶ 87. "On information and belief, the bullets that killed Wallace and Marsh were fired by a 'machine gun' or 'assault weapon' as those terms are defined by the Strict Liability Act." *Id.* Only the plaintiff Lawson qualified his allegation by stating that he was "most likely" shot by a weapon covered by the Act, but that does not affect the sufficiency of the allegation.

access to the weapons that were physically associated" with the individual plaintiffs' claims. The plaintiffs point to several avenues for linking a firearm to a particular manufacturer that may be open to them in discovery, and even if all seem "speculative" to us as a way of arriving at that link, none may be rejected at this stage. *See Arnold v. Moore*, 980 F.Supp. 28, 37 (D.D.C.1997) (dismissal inappropriate even though prisoner-plaintiff had "fail[ed] to identify or name the [individual prison-officer] defendants who allegedly assaulted [him]"; "[i]f, after discovery, the plaintiff still has not provided the names of the defendant ... officers ..., the Court may make a determination at that time whether ... judgments should be granted in favor of the defendants"); *and see, by contrast, Bly v. Tri–Cont'l Indus., Inc.*, 663 A.2d 1232, 1236 (D.C.1995) (summary judgment properly granted manufacturers *after discovery* for "lack of evidence as to which of [defendant's] products" caused plaintiffs' injuries).

In *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court stated:

> [A]ll the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which its rests.... Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. Following the simple guide of [Fed.R.Civ.P.] Rule 8(f) that "all pleadings shall be so construed as to do substantial justice," [14] we have no doubt that [plaintiffs'] complaint ade-

quately set forth a claim and gave the [defendants] fair notice of its basis.

*Id.* at 47–48, 78 S.Ct. 99 (footnotes omitted). Although we are less certain in this case about the adequacy of the complaint under these principles, we likewise follow Rule 8(f)'s command in holding that the plaintiffs have satisfied the pleading requirements of Rule 8. At the same time, however, if they are unable after discovery to tie a particular defendant to a particular injury-producing weapon, they will not be entitled to proceed under the Act against that defendant.

### C. Constitutional Challenges

■ Acts of the legislature are presumptively valid, *see Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984), and thus a court may invalidate an otherwise lawful enactment "only upon a plain showing that [the legislature] has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Nevertheless, the defendants argue that the SLA violates both the Commerce Clause and due process principles applicable to the District through the Fifth Amendment. In essence their argument is that, by imposing strict liability on firearms manufacturers for conduct that is wholly lawful where it takes place—*i.e.,* the lawful manufacture, production and distribution of firearms outside of the jurisdiction of the statute—the SLA impermissibly burdens the lawful interstate commerce of firearms and "arbitrarily" attempts to impose a regulatory scheme beyond the boundaries of the jurisdiction enacting it. We consider first the Commerce Clause argument, then the claim of violation of due process. Neither argument persuades us.

---

14. *See* Super. Ct. Civ. R. 8(f).

### 1. Commerce Clause

"Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' [or dormant] aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys. v. Department of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *see District of Columbia v. Eastern Trans–Waste of Md., Inc.*, 758 A.2d 1, 16 (D.C.2000). Of course, "[l]egislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution." *Head v. New Mexico Bd. of Exam'rs in Optometry*, 374 U.S. 424, 428, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) (citations and internal quotation marks omitted). In particular, "the Constitution when conferring upon Congress the regulation of commerce, ... never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Id.* (internal quotation marks omitted). Under the "two-tiered approach" adopted by the Supreme Court,

> [w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor instate economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the [s]tate's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citations omitted).

The vice against which the first, or anti-discrimination, component of this test operates is "local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). No serious argument is made that the SLA exhibits economic protectionism. Because there *are* no legal manufacturers, distributors, or sellers of assault weapons and machine guns in the District of Columbia,[15] the SLA does not discriminate in favor of instate business or economic interests against their out-of-state counterparts. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) ("[S]ince there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless."). And, contrary to what the defendants do argue, the SLA does not "directly regulate[ ] ... interstate commerce." *Brown–Forman Distillers Corp.*, 476 U.S. at 579, 106 S.Ct. 2080. It does not regulate in any direct sense, but instead imposes liability in tort for harm caused by an abnormally dangerous subset of firearms; and it limits that right of action to injuries incurred in the District of Columbia. It may have *effects* outside of the District if manufacturers alter their business practices to avoid that liability, but "[l]egislation ... may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution."

---

**15.** The manufacture and distribution of machine guns is prohibited in the District, D.C.Code § 7–2504.01 (2001), as is their possession. *Id.* §§ 7–2502.01 & –2502.02(a)(2).

*Head*, 374 U.S. at 428, 83 S.Ct. 1759 (citation and internal quotation marks omitted). *See Sherlock v. Alling*, 93 U.S. 99, 103, 23 L.Ed. 819 (1876) (state statute "declar[ing] a general principle respecting the liability of all persons within the jurisdiction of the State for torts resultin[g] in the death of parties injured" does not offend the dormant Commerce Clause); *Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d 28, 46 (D.Mass.2002) (rejecting argument that "the dormant Commerce Clause precludes state tort law from regulating any activity that, while having local effects, also effectuates some external consequences").

The defendants rely primarily on *Brown–Forman, supra*, and *Healy v. The Beer Institute*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), both of which struck down state price control or "price affirmation" statutes that had "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State" that enacted them. *Id.* at 337, 109 S.Ct. 2491. But in contrast to these statutes, the Strict Liability Act "does not regulate the price of any out-of-state transaction, either by its express terms or by *its inevitable effect.*" *Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (emphasis added; internal quotation marks omitted). That the risk it creates of damage awards in the District may conceivably affect the defendants' pricing or insurance decisions related to a limited class of the products they manufacture is not the "direct[ ] control[ of] commerce," *Healy*, 491 U.S. at 336, 109 S.Ct. 2491 that the Commerce Clause forbids without more.

■■■■■ The validity of the SLA thus depends on whether it "imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *C & A Carbone, Inc.*, 511 U.S. at 390, 114 S.Ct. 1677 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). State regulation on subjects "relating to the health, life, and safety of ... citizens," *Head*, 374 U.S. at 428, 83 S.Ct. 1759 receives special deference in that analysis. *See Smith v. District of Columbia*, 436 A.2d 53, 58 (D.C.1981); *Electrolert Corp. v. Barry*, 237 U.S.App. D.C. 328, 331, 737 F.2d 110, 113 (1984). The "benefits" of the SLA to the District of Columbia are reflected in the legislative findings that accompanied its passage. The D.C. Council found (a) that "the increase in homicides in the District has been accompanied by a proliferation of use of assault weapons (*i.e.*, automatic and semi-automatic guns) in the community," with "[s]emi-automatic handguns represent[ing] a growing percentage of the handguns recovered by the [police and] ... involved in handgun crime"; (b) that "[a]ssault weapons, and the manufacture and distribution of assault weapons are abnormally and unreasonably dangerous, and pose risks to the citizens of and visitors to the District which far outweigh any benefits that assault weapons may bring"; (c) that "[i]t is foreseeable by manufacturers and distributors of assault weapons that the criminal or accidental use of assault weapons will cause injury and death"; and (d) that the manufacture and distribution of these weapons "are among the proximate causes of the rising number of homicides in the District, exposing the citizens [of] and visitors to the District to a high degree of risk of serious harm." Findings (9), (10), (12), (13), & (14), 37 DCR 8483. The legislation, in short, addresses a pressing concern for public safety by giving innocent victims of gun violence in the District a cause of action against manufacturers or dealers for injuries caused by particularly dangerous firearms whose destructiveness far outweighs any legitimate utility they have.

In contrast to this strong governmental interest, any effect the SLA would have on interstate commerce is "incidental ... [and not] clearly excessive in relation to the ... local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. Only firearms the Council has classified as "abnormally and unreasonably dangerous"—those designed essentially to kill or intimidate, and for no other purpose in private hands—are covered by the Act, and liability attaches only for death or injuries resulting from the discharge of one of these weapons in the District of Columbia—and then only when the link has been established between a specific manufacturer and the gun that caused the injury. Moreover, assault weapons "originally distributed to a law enforcement agency or ... officer" are excluded from the statute's reach, § 7–2551.03(a), as are firearms used by persons injured while committing crimes or who injured themselves.[16] Section 7–2551.03(b), (e). Given these limitations, it is not apparent to us why the SLA's effect on interstate commerce is greater than that of other state laws imposing liability in tort on manufacturers of defective or abnormally dangerous products. *See, e.g., Tigue v. E.R. Squibb & Sons, Inc.,* 136 Misc.2d 467, 518 N.Y.S.2d 891, 897 (N.Y.Sup.Ct.1987), *aff'd,* 139 A.D.2d 431, 526 N.Y.S.2d 825 (1988), *aff'd sub nom. Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989) (holding that relaxation of the traditional product identification requirement in tort law to provide a forum to innocent victims of the drug DES was not a "clearly excessive" burden "in relation to the putative local benefits" and, hence, was not violative of the Commerce Clause). The

defendants profess alarm that the SLA, if upheld, will require them to alter their legal business practices on a national and international level. But given the limitations on the reach of the Act we have described, that fear seems fanciful, especially since it stems mainly from concern with the broader remedies the plaintiffs have sought—*i.e.,* injunctive and "abatement" relief—for the alleged negligence and public nuisance,[17] claims we have rejected here. In any event, the fact that exposure to "product liability in tort, whether strict or otherwise," may also

> affect commercial decisions by actors in other states, such as ... manufacturers, does not implicate the Commerce Clause. Differences in the conditions and risks of doing business from state to state are in part the inevitable result of *any* state economic regulation, but the effects that these differences have on commercial decisions, even those that involve interstate trade, are not by themselves nearly so direct as to 'affect commerce' in the constitutional sense.

*Bowman v. Niagara Mach. & Tool Works, Inc.,* 832 F.2d 1052, 1056 (7th Cir.1987) (emphasis in original).

## 2. Due Process

"A person who sets in motion in one State the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or an irresponsible instrument." *Young v. Masci,* 289 U.S. 253, 258, 53 S.Ct. 599, 77 L.Ed. 1158 (1933). As we have seen, the SLA imposes liability on out-of-state manufacturers of

---

**16.** To that extent, the statute incorporates the common-law defense of assumption of risk.

**17.** See Br. for Appellees to Div. at 71 ("By the injunctive relief or 'abatement' they request,

plaintiffs ultimately seek broad reforms in defendants' national and international business practices according to plaintiffs' own policy preferences.").

firearms (there are none in the District) for injuries caused to innocent persons from the "discharge of [an] assault weapon or machine gun *in the District of Columbia.*" D.C.Code § 7–2551.02 (2001) (emphasis added). The defendants nevertheless argue that the SLA constitutes an attempt by the District to impose its own policy choices as to gun regulation on other states where the manufacture of machine guns is lawful, thereby violating due process. They rely principally on *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)—or more precisely on two sentences from *Gore.* The first is the Court's statement that "it follows from ... principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572, 116 S.Ct. 1589. The second, providing the due process link, is that " '[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.' " *Id.* at 573 n. 19, 116 S.Ct. 1589 (citation omitted).

The defendants first of all confuse punishment—and the issue of punitive damages before the Court in *Gore*—with a state's authority to permit compensation to victims for injuries suffered within its jurisdiction. In *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), which also dealt with punitive damages and applied *Gore,* the Court made that distinction explicit. *See id.* at 416, 123 S.Ct. 1513 (explaining the "different purposes" served by compensatory and punitive damages). One looks in vain in either *Gore* or *State Farm* for a suggestion that a state may not permissibly decide that certain prod-

ucts, whether manufactured within or outside a state, are so dangerous that their manufacturers should face strict liability in tort for injuries the products contribute to within the State. *Gore,* in fact, affirmed a state's right to impose "economic penalties" on out-of-state manufacturers, "whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages," so long as such penalties are "supported by the State's interest in protecting its own consumers." *Gore,* 517 U.S. at 572, 116 S.Ct. 1589.[18] Under *Gore,* the SLA would violate due process only if it penalized manufacturers "for conduct that was lawful where it occurred *and that had no impact on [the District ] or its residents.*" *Id.* at 573, 116 S.Ct. 1589 (emphasis added); *see also State Farm,* 538 U.S. at 422, 123 S.Ct. 1513 (for punitive damage purposes, "[l]awful out-of-state conduct may be probative" if it has "a nexus to the specific harm suffered by the plaintiff"). In sum, no due process issue is raised by legislation that seeks to redress injuries suffered by District residents and visitors resulting from the manufacture and distribution of a particular class of firearms whose lethal nature far outweighs their utility. *See, e.g., City of Boston v. Smith & Wesson Corp.,* 66 F.Supp.2d 246, 250 (D.Mass. 1999) ("As plaintiffs here are seeking relief only on behalf of injured parties in Massachusetts, the holding of the *Gore* case does not apply.").

## VI. Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

**18.** The SLA does not provide for any award of punitive damages; by its terms it permits recovery only for "all direct and consequential damages." D.C.Code § 7–2551.02.

WAGNER, Chief Judge, concurring, in part, and dissenting, in part.

In my view, the trial court properly dismissed the individual plaintiffs' claims under the Strict Liability Act, D.C.Code § 7–2551.02 (the Act) set forth in their Third Amended Complaint.[1] Under this Act, a manufacturer, importer or dealer of an assault weapon is subject to liability *without fault* only if a plaintiff's injuries proximately resulted from the discharge of one of the weapons of that particular manufacturer, importer or dealer. D.C.Code § 7–2551.02. In this case, as the trial court concluded, plaintiffs did not allege that any one of the twenty-five (25) named defendants and one to one-hundred (1 to 100) DOE defendants is a manufacturer, importer or dealer of the weapon that actually caused them harm.[2] Even at the en banc argument, counsel for plaintiffs/appellants had to concede that they still cannot tie any of the individual defendants to a weapon that caused harm to any one of them. Thus, plaintiffs did not and cannot plead the predicate facts to hold any of the named defendants liable for their injuries under the Act. The failure to allege an essential element of the cause of action created by the Act is fatal to plaintiffs' pleading, and defendants are entitled to dismissal under our rules and precedents. *See* Super. Ct. Civ. R. 12(b)(6) (failure to state a claim on which relief can be granted); *see also Bible Way Church v. Beards*, 680 A.2d 419, 432 (D.C.1996), *cert. denied*, 520 U.S. 1155, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997) (affirming dismissal of breach of contract and tortious interference with contract claims under Rule 12(b)(6) be-

cause the complaint did not indicate that plaintiff had a contract with defendant).

To withstand a motion to dismiss for failure to state a claim, a plaintiff must " 'outline or adumbrate' a violation of the statute or constitutional provisions upon which the plaintiff relies, *Sutliff, Inc. v. Donovan Co.*, 727 F.2d 648, 654 (7th Cir. 1984), *and connect the violation to the named defendants; Patton v. Przybylski*, 822 F.2d 697, 701 (7th Cir.1987)." *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992) (emphasis added). Here, the complaint fails to connect plaintiffs' injuries to any of the named defendants. Even under the liberal "notice pleading" standard embodied in Super. Ct. Civ. R. 8(a)(2) and its federal counterpart, "it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.' " *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir.2001) (quoting *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir. Unit A Sept.8, 1981)). Identifying the party liable for a particular wrong is one of the most fundamental requirements for an adequately pleaded claim. *See Elmore v. Stevens*, 824 A.2d 44 (D.C.2003). In *Elmore*, this court rejected as inadequate a complaint that never alleged that the defendant did anything connected with plaintiff's claims. *Id.* at 46; *see also McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir.1979) ("[The court's] duty to be 'less stringent' with pro se complaints does not require us to conjure up unpled allegations."(quoting *Hurney v. Carver*, 602 F.2d 993 (1st Cir.1979)). Here, plaintiffs' failure to identify in the complaint the

---

1. Each of the amended complaints added party plaintiffs.

2. The complaint alleges that plaintiffs do not know the status of the 1 through 100 DOE defendants, but that each has "engaged in the

business of manufacturing, importing, marketing, distributing, selling, or dealing in firearms" and that "[e]ach regularly sells or solicits the purchase of its firearms in the District or derives substantial revenue from firearms used or consumed in the District."

manufacturer of the firearm which caused them harm negates any claim under the Strict Liability Act.

The Supreme Court's decision in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), quoted in the majority opinion at p. 655, does not support the conclusion that the complaint in this case is sufficient to withstand a motion to dismiss for failure to state a claim under our local strict liability statute. *Conley* involved a class action discrimination complaint by railroad employees against their union. The issue was whether more factual details about the alleged discrimination was required to avoid dismissal for failure to state a claim. *Id.* at 47, 78 S.Ct. 99. The complaint alleged, among other things, how petitioners came to be discharged or demoted, and "[d]espite repeated pleas by petitioners, the Union, acting according to plan, did nothing to protect them against these discriminatory discharges and refused to give them protection comparable to that given white employees"; that the Union failed to represent them in good faith; and, that the union's failure violated their rights under the Railway Labor Act to fair representation from their bargaining agent. *Id.* at 43, 78 S.Ct. 99. The defendant Union was identified clearly and placed on notice of the alleged acts or omissions forming the basis for the plaintiffs' claim of liability. Rejecting the argument that more specific facts were required to support the general allegations of discrimination, the Supreme Court held that the Federal Rules require only " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47, 78 S.Ct. 99 (quoting Fed.R.Civ.P. 8(a)(2)). The pleading standard was met in *Conley*; it is not met here. In *Conley*,

the Supreme Court simply held that the complaint adequately set forth a claim under Fed. R. Civ. 8; it did not relieve the plaintiffs of the obligation of identifying the defendant as a wrongdoer and placing it on notice of the claim against it. *See Elmore, supra*, 824 A.2d at 46 (citing *Keranen v. National R.R. Passenger Corp.*, 743 A.2d 703, 713 (D.C.2000)).

It is fundamental that a plaintiff must disclose sufficient information to put the defendant on notice of the claim against him. *Keranen, supra*, 743 A.2d at 713. The Act in question here imposes strict liability only for death or injuries resulting from the discharge of a particular kind of weapon, and then only when the link has been established between a specific manufacturer and the gun that caused the injury. D.C.Code § 7–2551.02. Plaintiffs have not alleged the requisite connection between the harm they sustained and any of the defendants in this case. Therefore, the complaint is deficient for failure to plead the predicate facts to make out the statutory cause of action. This court should not force a defendant into costly pre-trial discovery when there is no showing that plaintiff can make out a cause of action from the allegations in the complaint. *Sutliff, supra*, 727 F.2d at 654 (citations omitted). For these reasons, I respectfully dissent from Part V.B. of the majority opinion, and I would not reach the constitutional challenges to the Act addressed in Part V.C. However, I join in Parts I through IV. A. of the opinion of the court.